**OCEAN STATE PHYSICIANS HEALTH PLAN, INC., et al., Plaintiffs,**

v.

**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, Defendant.**

Civ. A. No. 86–0598–B.

United States District Court,
D. Rhode Island.

July 27, 1988.

**54**

Thomas A. Lynch, Lynch and Greenfield, Providence, R.I., William G. Kopit, Mark E. Lutes, Stuart Gerson, Epstein, Becker, Borsody & Green, P.C., Washington, D.C., for plaintiffs.

Patrick Quinlan, Quinn, Shectman & Teverow, Julius C. Michaelson, Providence, R.I., for plaintiff-intervenors.

Steven E. Snow, James Purcell, Partridge, Snow & Hahn, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

### STATEMENT OF FACTS

Defendant, Blue Cross & Blue Shield of Rhode Island, has been charged by Plaintiffs with restraint of trade and monopolization in violation of both federal and state law. After trial, a jury awarded Plaintiffs compensatory damages in the total amount of $2,693,437 and punitive damages in the amount of $250,000 for wrongful interference with contractual relationships, and found that Blue Cross & Blue Shield of Rhode Island was guilty of monopolization but awarded it no damages. Now pending are the Defendant's motion for judgment notwithstanding the verdict on the antitrust and tortious interference with contractual relationships claims. In the alternative, the Defendant seeks a new trial only on the interference with contractual relationships claims and not on the antitrust claims. Plaintiffs seek injunctive relief and an additur on the antitrust claims. In addition, the Defendant filed a counterclaim against the Plaintiff–Intervenors, the Physicians and Surgeons Association of Rhode Island, Inc. and thirteen individual members of the class, to prevent the Plaintiff–Intervenors from collectively negotiating fees with Blue Cross.[1]

Plaintiffs claimed that the Defendant violated Sections One and Two of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (Supp. 1986), violated the analogous Rhode Island Antitrust Statutes, R.I.Gen.Laws § 6–36–1 to 26 (Supp.1985), and breached the common law duty not to wrongfully interfere

---

1. The Physicians and Surgeons Association of Rhode Island and nineteen individual physicians intervened seeking injunctive relief and monetary damages against Defendant Blue Cross, a claim dismissed at trial. The Defendant Blue Cross also claimed against the Plain-

tiff–Intervenors alleging that Plaintiff–Intervenors violated Section One of the Sherman Act by conspiring to collectively negotiate with Blue Cross and sought injunctive and declaratory relief. There is no present threat to negotiate; therefore, the claim is denied as premature.

with contractual relationships. The Plaintiff Ocean State Physicians Health Plan, Inc. and the Plaintiff class of physicians sought monetary damages against the Defendant due to Blue Cross's business programs which for short hand purpose of reference are called prudent buyer, adverse selection, and HealthMate. Plaintiffs claimed that those programs were unlawful. Plaintiffs sought a permanent injunction prohibiting Defendant from using its prudent buyer and HealthMate programs.

## THE PARTIES

The Plaintiffs, Ocean State Physicians Health Plan, Inc. (Ocean State) and Anthony J. Kazlauskas and Jeffrey C. Winters, on behalf of the class of physicians, commenced suit against the Defendant Blue Cross & Blue Shield in September 1986. The class of physicians was defined by a court order dated April 2, 1987 to include "all physicians who contract with Ocean State to provide physicians services and who are also reimbursed by Blue Cross & Blue Shield of Rhode Island for the provision of physician services to defendant's subscribers." The Defendant, Blue Cross & Blue Shield of Rhode Island, is a non-profit hospital and medical services corporation which provides insurance for hospital and medical expenses.

Ocean State is a health maintenance organization (HMO) with headquarters in Warwick, Rhode Island. As an independent practice association type HMO, Ocean State contracts with physicians to provide medical care to its subscribers; Ocean State then pays its contracted physicians on a fee for service basis. Initially, subscribers paid little or no additional cost other than the premium paid to the HMO. The physicians' practice remained independent from the HMO.

In 1980, Ocean State submitted its license application to the Rhode Island Department of Health. It began operation by offering hospital and physicians costs coverage to employee groups of twenty-five or more. Originally, Medserco, a St. Louis based company managed Ocean State. Presently, United HealthCare, a Minnesota based company, manages Ocean State and is its single principal shareholder owning 20% of the stock. The remaining 80% of shares are held by some of the physicians who provide services to Ocean State subscribers. New Ocean State participating physicians pay up to $1,000 to contract with Ocean State to provide health services to Ocean State subscribers.

Ocean State is a federally qualified HMO. It determines its rates based on a community rating method. 42 U.S.C. Section 300e–1(8) provides that an HMO may choose to group by individual or family but within the chosen group, rates are to be equal subject to adjustment factors, such as age and sex. State law permits Blue Cross & Blue Shield to base its premiums for employer groups on the prior actual experiences of each particular insured group.

## FACTUAL BACKGROUND—PROCEDURAL

In April 1987, the Court granted Plaintiffs Winters' and Kazlauskas' motion for class certification after the Defendant failed to object. The class, as noted, included all physicians who contract with Ocean State and who are also reimbursed by Blue Cross & Blue Shield. It was estimated that 900 physicians were certified as members of the class.

Although in their original complaint Plaintiffs did not request a jury trial, they subsequently demanded a jury trial. At the conclusion of Plaintiffs' case, the Court granted the Defendant's motion for a directed verdict on all claims under Section One of the Sherman Act against Ocean State and the class of physicians. The Court also granted Blue Cross & Blue Shield's motion for a directed verdict against the Plaintiff–Intervenors. At the conclusion of the case, the jury returned a verdict finding Blue Cross & Blue Shield liable to both Ocean State and the class of physicians on the Section Two antitrust claims. The jury, however, awarded no damages. On the claim of tortious interference with contractual relationships, the jury found Blue Cross & Blue Shield liable

to Ocean State and awarded compensatory damages of $947,000 and punitive damages of $250,000. The jury also found Blue Cross & Blue Shield liable to the class of physicians on the interference with contractual relationships claim and awarded $1,746,437 in compensatory damages.

Pending before the Court are both equitable and legal claims. Plaintiffs move for a permanent injunction against prudent buyer and HealthMate. In addition, they seek an additur to the class of physicians on the antitrust claim. Defendant moves for a judgment notwithstanding the verdict on the antitrust claims and intentional interference with contractual relationships claims. In the alternative, the Defendant seeks a new trial on the claims of interference with contractual relationships.

## FACTUAL BACKGROUND

For many years Blue Cross of Rhode Island and Blue Shield of Rhode Island were the unchallenged leading health care financing organizations in Rhode Island. Blue Cross of Rhode Island was incorporated in the 1930's as a non-profit hospital service corporation that provided insurance coverage for hospital services. Blue Shield of Rhode Island was incorporated later and limited its insurance coverage to payment of physician charges. Blue Cross of Rhode Island and Blue Shield maintained separate Boards of Directors, reserves, and auditing of financial statements.

Under an administrative services agreement, however, Blue Cross provided management and staff for Blue Shield. Usually Blue Cross and Blue Shield policies were marketed together as a package to employers. Occasionally, an employer could purchase Blue Cross coverage alone, but employees were not permitted to purchase only Blue Shield coverage. Neither Blue Cross nor Blue Shield were marketed with other health insurance.

In 1971, Rhode Island Group Health Association (RIGHA) a group model Health Maintenance Organization (HMO) entered the Rhode Island health care financing market. A group model HMO employs physicians to serve the medical needs of its subscribers. Services are usually provided at a fixed location and this was initially true of RIGHA. RIGHA had little impact on Blue Cross & Blue Shield's share of the market. RIGHA entered into an agreement with Blue Cross & Blue Shield whereby RIGHA would purchase hospital services through Blue Cross. Thus, RIGHA enjoyed Blue Cross & Blue Shield hospital discounts; while Blue Cross & Blue Shield benefited because they then claimed RIGHA subscribers within their membership and thereby increased their claimed size of the market. As a result, Blue Cross was further able to negotiate favorable agreements for the cost of hospital care.

In addition, RIGHA entered into a joint marketing agreement with Blue Cross & Blue Shield to coordinate marketing activities. Both agreements were terminated in March 1982, after a newspaper article disclosed the arrangement. There was testimony, however, that the sharing of hospital and physician discounts continued through May 1986.

In 1980 at the time Ocean State applied to the Rhode Island Department of Health for licensing as an HMO, Blue Cross & Blue Shield continued to dominate the health care financing market. Blue Cross & Blue Shield controlled a very large percentage of the market. Competition from other health care financing insurers was virtually non-existent. RIGHA was then the only licensed HMO in Rhode Island and its market share was minimal.

Although Blue Cross & Blue Shield researched the financial background of Medserco, Ocean State's original management company, and considered using that information to discredit Ocean State's regulatory application, it did not do so. Blue Cross and Blue Shield took an active interest in Ocean State's licensing procedure, but did not oppose the application. Subsequently Ocean State's application was approved.

At about the same time Blue Cross and Blue Shield were negotiating a merger. In 1982, after two years of negotiations the two companies merged to form one corporation, Blue Cross & Blue Shield of Rhode

Island, [hereinafter Blue Cross & Blue Shield] which provided both hospital and physician insurance coverage. One Board of Directors and one Chief Executive Officer managed the new corporation.

In addition, the General Assembly of the State of Rhode Island enacted the Health Maintenance Organization Act of 1983, R.I. Gen.Laws §§ 27–41–1 *et seq.* (Supp.1986), which was modeled after the federal HMO Act, 42 U.S.C. § 300e–9 (Supp.1986). Rhode Island is unique in the large percentage of employees covered by employer provided health plans. The State Act incorporates a dual choice provision which requires employers to offer a licensed qualified HMO as an employee choice for health insurance if an HMO provides services in the area where the employee resides. Blue Cross & Blue Shield challenged this dual choice provision as inconsistent with provisions of the federal Employee Retirement Income Security Act (ERISA). *See* 29 U.S.C. §§ 1001–1461 (Supp.1987). In *Blue Cross of R.I. v. Cannon,* 589 F.Supp. 1483 (D.R.I.1984), the suit was dismissed because it was not ripe; however, it was noted that the employer's obligation to provide an HMO alternative is subject to the condition precedent of a request by an eligible HMO to be included in the health insurance offering.

As of the Spring 1986, Blue Cross & Blue Shield was faced with a serious competitive problem. While Blue Cross & Blue Shield lost approximately 30,000 of its 543,015 enrollees; Ocean State's enrollment exceeded the most optimistic expectations and had grown to 70,000. Blue Cross & Blue Shield's loss of enrollment was attributed to its increased premium rates and to its lack of an HMO plan which would provide more coverage than traditional Blue Cross & Blue Shield.

Rates had to be increased because Blue Cross & Blue Shield was experiencing financial difficulties. Its cash reserves had dropped below the State law requirement, which requires Blue Cross & Blue Shield to maintain an available cash supply sufficient to pay all operating expenses and claims for not less than a 1½ month period. *See*

R.I.Gen.Laws § 27–19–6 (Supp.1986). Payments of claims exceeded Blue Cross & Blue Shield's estimates and the amount of revenue generated through premiums was not sufficient to cover Blue Cross & Blue Shield's anticipated costs. Blue Cross & Blue Shield had to raise its premium rates. The increased rates further contributed to its loss of enrollment which further required higher rates to cover the losses due to enrollees dropping out.

Although Blue Cross & Blue Shield dominated the health care financing industry, the loss of enrollment created concern. There was conflicting testimony at trial about Blue Cross & Blue Shield's market share.

Plaintiffs claimed that Blue Cross & Blue Shield controlled 80% of the market. Defendant did not dispute that it was the largest health care cost insurer in Rhode Island, but would not agree that it controlled 80% of the market. Ocean State claimed that 656,650 persons in Rhode Island were eligible to procure private health coverage and that 543,015 persons selected Blue Cross & Blue Shield coverage. Therefore, according to Plaintiffs' calculations Blue Cross & Blue Shield's enrollment share was 82.7%.

Defendant downwardly adjusted this estimate of its market share by making three adjustments to the market share calculation. First, the estimated number of members covered under a family contract was reduced from 3.4 persons to 2.8 persons, which resulted in a 17.64% reduction of Blue Cross & Blue Shield's enrollment share. Next, duplicate coverage was factored into the calculation. The Defendant had assumed that 12% of Blue Cross & Blue Shield's enrollees had duplicate coverage with another Blue Cross & Blue Shield plan and that 8% of Blue Cross & Blue Shield's enrollees had duplicate coverage with another company. Thus, adjustments to the market reduced Blue Cross & Blue Shield's market share to 62.8%. Finally, Blue Cross & Blue Shield assumed the Rhode Island employment base was 10% greater than reflected in the Rhode Island population count because more workers

came into the State to work than left the State to work. So Blue Cross & Blue Shield estimated that the total population eligible to select Blue Cross & Blue Shield coverage was 722,315 persons (the Rhode Island population 656,650 + the non-state resident workers 65,665). With the foregoing adjustments, Blue Cross & Blue Shield's market share was 57.1%. The Defendant, although it disputed the Ocean State estimate of Blue Cross & Blue Shield's market share, agreed that it had a substantial share of the market. This was an admission of the obvious. Blue Cross & Blue Shield is clearly the major provider of private health care cost payment in Rhode Island and thus it is the major factor in the competitive market. It clearly had market power. The issue here is whether or not it exercised that power unlawfully.

Both Blue Cross & Blue Shield and Ocean State were experiencing financial problems at about the same time during the Spring and Summer of 1986. Blue Cross & Blue Shield was facing enrollment losses and increased premiums; while Ocean State's operating costs were exceeding its income. Both Ocean State and Blue Cross & Blue Shield had to make changes and adopt new programs. Blue Cross & Blue Shield responded with the prudent buyer policy, adverse selection, and Health-Mate. Ocean State went through a major reorganization, increased the amount of payment subscribers were required to pay for services rendered, and created a program called Speciality Incentive Pools (SIPS).

In May 1986, the Blue Cross & Blue Shield's Board of Directors approved a three prong approach to deal with Blue Cross & Blue Shield's loss of enrollment and financial difficulties. The plan included (1) implementing the "prudent buyer policy," (2) instituting "adverse selection rating factors" and (3) marketing of a new product, which was ultimately called "HealthMate." Blue Cross & Blue Shield submitted a series of riders to the classic hospital and medical service plans to the Department of Business Regulations, (DBR), State of Rhode Island for its approval. The DBR approved the new HealthMate product, which was known as the "Z Plan," "Maps Plus," and "Plan 100 Plus." HealthMate provided 15% more coverage than standard Blue Cross & Blue Shield. It included hospital and medical service plans plus other coverage such as office visits, prescription drugs, student rates, and "good health" benefits. Under HealthMate, subscribers must use participating physicians otherwise the plan would not pay for physician services. In addition, all Blue Cross & Blue Shield participating physicians are required to provide services under HealthMate and to accept the HealthMate payment as payment in full if they wished to remain Blue Cross & Blue Shield participating physicians.

HealthMate was first offered to employees of the State of Rhode Island in July, 1986. This is the largest single group of employees covered by an employer health plan in Rhode Island, and no doubt, that fact prompted the creation of HealthMate. The Department of Administration, the State agency which awarded contracts for health coverage, extended its open enrollment season for selecting a health plan so that HealthMate could be offered. Later, HealthMate was offered to other experience rated groups. HealthMate was never offered alone as a health insurance plan, but was only marketed as an alternative to traditional Blue Cross & Blue Shield if a competing HMO was also being considered as a health insurance option. Today, HealthMate is offered to all employer groups with more than 50 employees.

HealthMate was marketed with financial incentives for employers. If the employer paid the full cost of its employees' health insurance, HealthMate was offered at the same rates as traditional Blue Cross & Blue Shield. If employees were required to contribute to their coverage, then HealthMate was offered at 5% below the cost of traditional Blue Cross & Blue Shield. Ocean State claimed that between June 1986 and August 1987, it lost profits of $58,550 because of the head to head marketing and low cost of HealthMate. In addition, Ocean State estimated a $59,041 future loss of profits through June 1988.

To support the tiered pricing for Health-Mate and traditional Blue Cross & Blue Shield coverage, Blue Cross & Blue Shield approved an adverse selection policy on June 1, 1986. Blue Cross & Blue Shield implemented the adverse selection policy without approval from the Department of Business Regulation (DBR). In October 1986, DBR ordered Blue Cross to cease using the adverse selection policy until it obtained DBR approval. On November 12, 1986, the DBR approved the adverse selection factors and Blue Cross resumed use of the adverse selection policy.

Blue Cross & Blue Shield was concerned that it would be adversely selected by subscribers if other health plans were offered. "Adverse selection" is jargon which means exactly the opposite of what it says. It has nothing to do with selection of Blue Cross. It is the opposite, the selection of a competitor by a Blue Cross subscriber. It means that Blue Cross & Blue Shield was concerned that it would lose its best (least expensive) members. It was concerned that it would lose a large percentage of its younger/healthier subscribers to a different company with a more comprehensive preventive health plan and be left with an older, less healthy population, causing its claims costs per subscriber to increase. Thus to reflect this possible increase in cost per subscriber, adverse selection factors were applied.

Under the adverse selection policy, employers were offered three different rates for Blue Cross & Blue Shield indemnity coverage. Employers would be charged the lowest rate if the the employer only offered traditional Blue Cross & Blue Shield coverage. If the employer offered traditional Blue Cross & Blue Shield, a competing HMO and HealthMate, then the rate for traditional Blue Cross & Blue Shield would be at a middle level. If an employer offered traditional Blue Cross & Blue Shield and a competing HMO but refused to offer HealthMate, then the highest rate for traditional Blue Cross & Blue Shield coverage would be charged.

Adverse selection rate differentials were determined based on a formula which Blue Cross & Blue Shield designed. The formula incorporated two estimates. The first estimate was called the health factor, which concluded that HMO enrollees, on the average, would be 22% healthier (22% less expensive) than the aggregate membership of the employed group.

The second estimate in the adverse selection calculation was Blue Cross & Blue Shield's estimate of the number of subscribers that might enroll in competitive health plans. The estimate was not based on Blue Cross & Blue Shield's prior experience of subscribers switching health coverage but on Blue Cross & Blue Shield's projection. Ocean State contended that Blue Cross & Blue Shield overestimated the number of subscribers who would be lost to competing HMOs, causing the adverse selection calculation to be higher than what was necessary to ensure that its premiums reflected its costs.

In February 1987, the Department of Business Regulations (DBR) released a study of the number of Blue Cross & Blue Shield enrollees that switched to HMOs. It found that fewer enrollees dropped traditional Blue Cross & Blue Shield coverage and replaced it with HMO coverage than Blue Cross & Blue Shield had projected. Many employers complained to DBR about the substantial increase in their premiums, partly due to the adverse selection factors, and they threatened to discontinue Blue Cross & Blue Shield coverage. In February 1987, Blue Cross & Blue Shield decided to base its calculation of losses to competing HMOs upon actual lost enrollment. Thus, the second estimate factor in the adverse selection calculation was adjusted as of February 1987.

Ocean State asserted that the overestimate of loss of subscribers to competing HMO artificially increased price differential which discouraged employers from offering a competing HMO, such as Ocean State. Furthermore, Ocean State claimed that the rate differentials were designed to discourage employers from offering competing health insurance options, or alternatively to force employers to offer Health-

Mate if a competing health plan was an option.

Meanwhile, the financial circumstances of Ocean State were also under stress. As a new HMO, Ocean State decided in 1983 that it would withhold 20% of the physicians' fee until the end of the year at which time if Ocean State's operational expenses were in the black then the withholding would be paid to the physicians. This was seen as an incentive to its contracted physicians to keep health care costs low. In 1984 Ocean State returned the withhold to physicians. In 1985, however, Ocean State retained the withhold because cost of operating exceeded Ocean State's estimates. This action occurred in 1986.

Ocean State memberships had risen astronomically, but the rate of increase began to level off. In the spring and summer of 1986, it began to experience financial concerns not different from those of Blue Cross & Blue Shield. Ocean State initiated a drastic management change on July 1, 1986, and designed new incentives for physicians to maintain costs. Not coincidentally, these initiatives were roughly coincident with Blue Cross's trilogy of programs, HealthMate, adverse selection and prudent buyer.

In an effort to control expenses and hopefully to provide a dividend to its physician members, Ocean State implemented the Speciality Incentive Pools (SIPs) as of November 1, 1986. Speciality Incentive Pools is another instance of jargon. It simply means that the physician would be paid his or her full charge rather than only 80% of the charge, if there was enough money left in the pool at the end of the year to do so. Ocean State divided participating physicians into specialty categories. Each specialty was allotted a certain sum of money as its operating budget. Physicians were paid 80% of their charges. If expenses for the specialty category did not exceed estimated operational cost, then the remaining funds in the specialty category would be divided among physicians in that group. Each specialty group had a very good reason to provide services at the lowest cost; thus, the name Speciality Incen-

tive Pools. The 1986 operational cost exceeded Ocean State's estimates. Therefore, nothing additional was paid to participating physicians through the Speciality Incentive Pools.

Blue Cross & Blue Shield expressed concern that physicians were giving greater discounts to Ocean State than to Blue Cross & Blue Shield. In response to the March 25, 1986, decision of Ocean State to retain the 1985 withholdings, Blue Cross & Blue Shield announced the prudent buyer policy on June 6, 1986. The policy, however, did not become effective until November 1, 1986.

Prudent buyer is more jargon. What it means is that Blue Cross & Blue Shield would not pay more to a physician than what the physician was willing to accept for performing the same services for another health care cost provider, including Ocean State. Thus, if physicians were accepting 80% of their charges as payment in full from Ocean State, then Blue Cross would also pay only 80% of physicians charges, as payment in full. Plaintiffs asserted that the prudent buyer policy was fashioned after Blue Cross & Blue Shield's hospital participation policy. Under that policy Blue Cross & Blue Shield participating hospitals who offered competitors discounts, which were comparable or better than the approximate 13% discount provided Blue Cross & Blue Shield, were threatened with termination of their status as participating providers. The hospital participation policy had been successfully implemented and permitted Blue Cross to buy hospital services at the lowest rate.

Under the prudent buyer policy, Blue Cross & Blue Shield would not pay more for physician services than the lowest payment the physician accepted for such services. At trial Blue Cross & Blue Shield contended that it was only trying to get the best price for its subscribers. Blue Cross & Blue Shield required physicians to document that the fees the physicians charged Blue Cross & Blue Shield were the lowest that the physicians charged for that particular service. If a physician failed to document by September 15, 1986 that he or

she was not charging Blue Cross & Blue Shield more than he or she was charging its competitors, then Blue Cross & Blue Shield reduced its reimbursement to the physician by 20%. There was evidence that Blue Cross & Blue Shield understood the ramifications of the prudent buyer policy. A handwritten note by a Blue Cross & Blue Shield management employee stated that "not one guy in the state isn't going to know the implication of signing with Ocean State." Plaintiffs made much of this observation.

Plaintiffs contended that approximately one-third of Ocean State's participating physicians resigned from Ocean State as a result of the prudent buyer policy. Testimony was, however, that physicians resigned for many reasons. Some physicians claimed they resigned because they were concerned about the effect of the prudent buyer policy upon their Blue Cross & Blue Shield patients. Others claimed that they could not afford to have their Blue Cross & Blue Shield payments cut by 20%. It is clear that some physicians resigned from Ocean State because of the prudent buyer policy, but is also abundantly clear that the actual number was far less than that contended by Ocean State.

Because about 350 of its 1200 participating physicians resigned, Ocean State claimed that it had to pay for the services of more non-participating physicians in order to provide physician services to its members at a level comparable to the level which existed before the physicians resigned. Although the physicians resignations represented a cross section of specialties, Ocean State contended that certain specialties were harder hit, such as cardiac surgery. Thus, Ocean State had to buy more services from non-participating physicians, which was more expensive. As a result, Ocean State contended that it incurred greater cost for providing physician services to subscribers. Therefore, Ocean State claimed that due to the prudent buyer policy, it had to pay an additional $946,260 to non-participating physicians between January 1987 and March 1987.

In addition, Ocean State contended that the reduction of participating physicians caused a reduction in subscribers. There was testimony that some subscribers dropped Ocean State when their personal physicians resigned from Ocean State. Ocean State would not pay the physician for services rendered to the patient and the patient would have to pay the physician without reimbursement from Ocean State. Ocean State claimed it lost $597,016 in profits on enrolled members who dropped Ocean State between November 1986 and August 1987.

Ocean State presented evidence that under the prudent buyer policy, Blue Cross & Blue Shield withheld more than $1,900,000 from Ocean State's 1200 participating physicians. The certified class, however, included an estimated 900 physicians. During the time between implementation of the prudent buyer policy and the class certification, more than 300 physicians resigned from Ocean State. Those physicians who had prudent buyer withholds but were not participating physicians of Ocean State in April 1987 did not meet the definition of the class certification. The certified class of physicians claimed Blue Cross & Blue Shield withheld $1,425,000 from it.

Blue Cross & Blue Shield acknowledged that under the prudent buyer policy between January 1, 1987 and May 30, 1987 it withheld $2,058,769.58. During this period, providers requested $682,351.36 in refunds. Blue Cross & Blue Shield estimated that the refund payments would be $136,470.27 per month. Blue Cross & Blue Shield estimated that it would withhold $2,838,199.34 between November 1, 1986 and June 30, 1987. The refund estimates for this eight month period were $1,091,762.17. Thus, Blue Cross & Blue Shield's projected prudent buyer savings during this eight month period would be $1,746,437.17.

Blue Cross & Blue Shield contended that the prudent buyer policy, adverse selection policy, and the marketing of HealthMate were exercises of good business judgment. Blue Cross & Blue Shield asserted that Ocean State's financial loss were due to both its being a young HMO and misman-

agement. There was testimony that all young HMOs lose money in the initial years. Between June and July 1986, Ocean State attempted to reduce financial losses by switching its underwriters to United HealthCare, reducing the management fee, replacing its Chief Executive Officer, and instituting co-payments for office visits. There was conflicting testimony whether those changes were sufficient to put Ocean State in the black. Blue Cross & Blue Shield contended that between June 30, 1986 and September 30, 1986, Ocean State had profits of $227,123. It contended that by the end of 1986, Ocean State's profits were $698,348. Thus, Blue Cross & Blue Shield claimed that adverse selection, HealthMate, and the prudent buyer policy did not cause Ocean State to lose money. Ocean State, however, asserted that those figures were deceptive and did not accurately reflect the impact of Blue Cross & Blue Shield's actions.

Ocean State claimed that it incurred a $809,158 loss involving hospital discounts between January 1984 through May 1986; a $597,016 loss of profits on enrolled members who terminated their coverage with Ocean State between November 1986 and August 1987; a $117,591 loss of potential profits on possible state employee enrollees who did not contract with Ocean State due to the State of Rhode Island's contract with Blue Cross which offered HealthMate, between June 1986 and June 1988. Ocean State asserted that it lost $173,013 from expected profits which failed to materialize because of Blue Cross's actions. Thus, Ocean State claimed it lost a total of $1,696,798 due to Blue Cross's anticompetitive actions. The physicians class claimed it lost $946,760 between January 1987 and March 1987 due to Ocean State's payments to non-participating physicians and $1,900,-000 due to the prudent buyer policy. They claimed a total loss of $2,846,260. The jury verdicts, however, awarded $947,000 to Ocean State and $1,746,437 to the Plaintiff class of physicians.

The jury's verdicts in this action are at variance with the proof. On the third try, after the jury had been returned to the jury room twice for reconsideration of its ver-dict, the jury returned a verdict for Plaintiffs on its Section 2 Sherman Act claims, but failed to award any damages. The jury awarded damages against Blue Cross & Blue Shield on the claims of intentional interference with advantageous relationships on behalf of Ocean State in the amount of $947,000 compensatory damages and $250,000 punitive damages and for the class of physicians in the amount of $1,746,437 in compensatory damages.

The jury deliberated two days before returning a verdict finding Blue Cross & Blue Shield "Guilty" on both counts, the Section 2 Sherman Act violation and the common law tort of interference with advantageous relations. Initially, the jury awarded each Plaintiff, Ocean State and the class physicians, compensatory damages of $2,693,437 (not coincidentally $1,746,437 + 947,000) and punitive damages of $250,000. Ocean State and the class of physicians suffered different injuries and damages. It was thus highly unlikely that each Plaintiffs' award for damages would be exactly the same. Recognizing that more than mere coincidence could be a factor, the Court explained the purpose of each verdict form and that the jury must award damages separately for each Plaintiff and for each claim based on the evidence.

After further deliberation, the jury returned the second set of verdict forms. It again found Blue Cross & Blue Shield "Guilty" as to both the antitrust claims and the interference with contractual relationships claims brought by both Ocean State and the class of Physicians. On the verdict form for *Ocean State v. Blue Cross & Blue Shield,* the jury listed compensatory damages of $947,000 and punitive damages of $250,000. On the verdict form for the class of physicians, the jury listed compensatory damages of $1,746,437. Neither of the second set of verdict forms stated whether the award was for damages on the antitrust claim or for interference with contractual relationships claim or both. The jury was then instructed that the verdict must clearly state the specific claims upon which it awarded damages.

After further deliberation, the jury returned its third set of verdict forms. The total amount of the damage awards equaled the same amount as the second verdict forms. The verdict form for *Ocean State v. Blue Cross & Blue Shield* stated that as to the Section 2 of Sherman Act claim, Blue Cross & Blue Shield was guilty but awarded no damages. As to the interference with contractual relationships, the jury found Blue Cross & Blue Shield guilty and awarded Ocean State compensatory damages of $947,000 and punitive damages of $250,000. On the verdict form for the *Class of Physicians v. Blue Cross & Blue Shield*, the jury found Blue Cross & Blue Shield guilty of the Section 2 of the Sherman Act claim, but awarded no damages. On the interference with contractual relationships claim, the jury found Blue Cross & Blue Shield guilty and awarded the class of physicians compensatory damages of $1,746,437.

The Defendant contends that the compensation award to Ocean State is based on the Plaintiffs' Exhibit 776 (for identification) prepared by one of Plaintiffs' damages expert and used by her as a basis for her testimony. In this the Defendant is clearly correct. Exhibit 776 is a three column simulated spreadsheet. The headings for the columns were lost profits, (Ocean State) lost hospital discounts, (Ocean State) and lost payments for the physicians' class. Under the heading lost payment to the physicians' class was a subsection entitled payments by OSPHP to non-participating physicians 1/87—3/87. This section reported $946,260 payments Ocean State made to non-participating physicians between January 1987 and March 1987. Plaintiffs' evidence is that $946,260 represents payments by Ocean State to "Non-Participating Physicians 1/87—3/87 $946,260." The jury simply rounded to the next nearest thousand the $946,260 payment to non-participating physicians to arrive at the $947,000 and erroneously awarded it to Ocean State.

The payment Ocean State made to non-participating physicians between January and March 1987, was not a loss to Ocean State. This much the Plaintiffs must con-

cede because they themselves claim this loss for the class of physicians. This money would have been returned to participating physicians. Ocean State budgeted the $946,260 to the Speciality Incentive Pools (SIPS's). Ocean State was required to pay the $946,260 to either the physicians in the SIPS pools if the Speciality Incentive Pools' costs were less than the amount budgeted or if the Speciality Incentive Pools' costs exceeded Ocean State's estimates, then the $946,260 would have been used to reduce the Speciality Incentive Pools' excess costs. Either way, Ocean State itself could not have lost money because of payments to physicians who were not Ocean State participating physicians. The losses due to Ocean State's payments to non-participating physicians was suffered by Ocean State participating physicians. They would have received the $946,260, if Ocean State had not had to pay that amount to non-participating physicians.

The Defendant also contends that the compensatory damages award to the certified class of physicians is based on another Plaintiffs' Exhibit, Plaintiffs' Exhibit 563. Exhibit 563 was an in house Blue Cross & Blue Shield document dated June 30, 1987 and entitled projected prudent buyer savings. Blue Cross & Blue Shield estimated that the prudent buyer policy would save a net amount of $1,746,437.17 over an eight month period. It appears that the jury rounded the $1,746,437.17 by omitting the 17 cents and based its awarded to the class of physicians on the amount of money Blue Cross & Blue Shield intended to save with the prudent buyer policy.

Exhibit 563 is Plaintiffs' evidence of the amount of money Blue Cross & Blue Shield expected to save due to the prudent buyer policy. It, however, does not indicate the damages the certified class of physicians incurred as a result of Blue Cross & Blue Shield's interference with their contractual relationships. The class was composed of physicians who were under contract to Ocean State and were also reimbursed by Blue Cross & Blue Shield. The withheld payments were payments Blue Cross & Blue Shield did not make to Blue Cross &

Blue Shield physicians. Ocean State contracted physicians therefore had no right to receive the withheld payments, except if they also participated in Blue Cross & Blue Shield and their payments had been reduced by Blue Cross & Blue Shield. Since Blue Cross & Blue Shield had many more participating physicians than Ocean State, there is no basis to conclude, as the jury did, that the withheld payments belonged to Ocean State physicians who were reimbursed by Blue Cross & Blue Shield. It is inappropriate to conclude that the certified class of physicians must have incurred losses equal to Blue Cross & Blue Shield's prudent buyer savings.

## DISCUSSION

### Standard of Review

■ In actions which blend claims for both legal relief in terms of monetary damages and equitable relief by way of injunction, a jury shall first determine the issue of damages. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962); *Wallace Motor Sales v. American Motor Sales Corp.,* 780 F.2d 1049, 1066 (1st Cir.1985). The effect of a jury's determination as in this instance is significant. Here the jury returned a verdict that the Defendant Blue Cross & Blue Shield was guilty of violating Section 2 of the Sherman Act (15 U.S.C. § 2). The jury declined, after three attempts, to assess monetary damages. Generally speaking, it has been held that since the legal issues are to be heard first in an action under Section 2 of the Sherman Act (15 U.S.C. § 2), findings by the jury in the damages action, also involved in the application for equitable relief, are binding upon the trial court in its later consideration of the facts involved in equitable relief applications. *Florists' Nationwide Tel. Del. Net. v. Florists' Tel. Del. Assn,* 371 F.2d 263, 271 (7th Cir.) *cert. denied,* 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967); *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 690 (9th Cir.), *cert. denied,* 429

U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).

Indeed, the parties in this action, although in disagreement on almost every issue, seem to be in agreement on this aspect, to the effect that this Court is bound by the jury's determination of the factual issues. Thus, Plaintiffs are able to assert that the jury has concluded that Defendant's business practices of the prudent buyer policy, selective marketing of Healthmate, and its adverse selection policy were anti-competitive and illicit activity contrary to the purpose of the Sherman Act to provide competition, and, that these determinations bind this Court. Of course, Blue Cross & Blue Shield argues that since no damages were awarded, Plaintiffs have failed to prove injury, and therefore, the Sherman Act counts fail. However, before the Court determines to what extent it is bound by the findings of the jury, it will first determine if the jury verdict is supported by the evidence at all.

■ The standard of review in setting aside a jury verdict is narrow. In determining the motion for judgment notwithstanding the verdict, the Court must evaluate the evidence in the light most favorable to Plaintiffs. *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 989 (1st Cir.1978). But the plaintiffs are not entitled to unreasonable inferences based on speculation and conjecture. *See Carlson v. American Safety Equip. Corp.,* 528 F.2d 384 (1st Cir.1976); *Schneider v. Chrysler Motors Corp.,* 401 F.2d 549, 555 (8th Cir.1968). A motion for judgment notwithstanding the verdict should be granted "... when as a matter of law, no conclusion but one can be drawn." *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 849 (1st Cir. 1985) (citing *United States v. Articles of Drug Consisting of the Following,* 745 F.2d 105, 113 (1st Cir.1984), *cert. denied sub nom.,* 470 U.S. 1004, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985)), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). Therefore a motion for judgment notwithstanding the verdict should be denied if after reviewing the evidence in the light most favorable to the plaintiffs and draw-

ing all reasonable inferences in their favor, there is sufficient evidence to support the verdict. *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *CVD, Inc.,* 769 F.2d at 849. A jury verdict supported by the evidence may not be set aside simply because the judge would have reached a different result. *See Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

The standard of review for granting a new trial is not as stringent as for granting a judgment notwithstanding the verdict. But the trial judge may not set aside a verdict simply because he or she would have reached a different verdict. *Borras v. Sea–Land Serv., Inc.,* 586 F.2d 881, 887 (1st Cir.1978). In granting a motion for a new trial the judge must find that "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37 (1st Cir.1988); *see CVD, Inc.,* 769 F.2d at 848 (citing *Coffran* 683 F.2d at 6).

The Court will first determine whether there is sufficient evidence to support the jury verdict on the antitrust claims and the claims for the interference with contractual relationships. Then the Court will address the applications for injunctive and declaratory relief.

### ANTITRUST CLAIMS

With respect to the Defendant's motion for judgment n.o.v. on the antitrust claims, it asserts two legal theories. First, the Defendant contended that the jury's findings of "no damages" for the antitrust claims indicated that no injury resulted to Plaintiffs' business or property as a result of antitrust violations. Thus, it contends no liability arose for a private damage action under the Clayton Act, Section 4. 15 U.S.C. § 15 (Supp.1988). Noting that the Plaintiffs suffered no injuries as a result of the Defendant's conduct, Defendant concludes that Plaintiffs failed to prove all elements of an antitrust violation and requested the Court to enter judgment in its favor on the Sherman Act Section 2 claims.

 Defendant's argument warrants some attention as a ground for granting Defendant's motion for judgment notwithstanding the verdict on the antitrust claims. Plaintiffs filed this action seeking treble damages under Section Fifteen of the Sherman Act, 15 U.S.C. § 15. (Supp. 1988). It is a remedial provision of the Sherman Act. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 485, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1977). It frequently has been called the private attorney general provision of the antitrust laws because a private Plaintiff rather than the government may maintain an action for an alleged antitrust violation. *See, e.g., Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954). Section Fifteen of the Sherman Act, more commonly known as Section Four of the Clayton Act, provides that a Plaintiff can recover threefold the damages he sustains and the cost of the suit, including attorney's fees if the Plaintiff shows an injury in his business or property by reason of anything forbidden in the antitrust laws. *See* 15 U.S.C. § 15 (Supp.1988). So for Plaintiffs to prevail on their antitrust claims, they must prove "... a violation [of the antitrust laws] and additionally show to a reasonable degree of certainty that there has been injury to them by reason of the violation." *See International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1270 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). To establish an antitrust violation, Plaintiffs must show that Blue Cross & Blue Shield engaged in monopolization acts in violation of Section Two of the Sherman Act. Section Two of the Sherman Act defines the criminal violation of monopolization and its penalties. 15 U.S.C. § 2 (Supp. 1988). But the mere existence of a viola-

tion cannot support a private action under Section Four of the Clayton Act. *See Gray v. Shell Oil Co.,* 469 F.2d 742, 749 (9th Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). Plaintiffs must show that they suffered an injury to business or property as a result of the antitrust violation. *See Hawaii,* 405 U.S. at 262, 92 S.Ct. at 891. What constitutes an injury to business or property is less than clear. The words "business or property" refer to commercial interest. *See id.* at 264, 92 S.Ct. at 892. However, injury to business or property is defined in terms of a tautology. Since Section 4 of the Clayton Act provides a money damages remedy, it must be an injury which the jury is able to quantify in dollars. It is the kind of injury that the antitrust laws were designed to prevent, namely damage as a result of anti-competitive conduct. *See Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. at 697. Plaintiffs do not have to prove that the antitrust violation was the sole cause of the injury. *See Zenith Radio Corp.,* 395 U.S. at 114, 89 S.Ct. at 1571. But the Plaintiffs must show a causal relationship between the injury and the violation. *See id.* at 114 n. 9, 89 S.Ct. at 1571–72 n. 9. Furthermore, the Plaintiffs must prove some indication of the amount of damages. *See, e.g., Construction Aggregate Transport, Inc. v. Fla. Rock Indus.,* 710 F.2d 752, 782 (11th Cir.1983); *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 270 (5th Cir.1979); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. denied,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Thus, "[t]o be 'liable' under the antitrust laws ... means that one has to violate the antitrust laws and that violation has resulted in an injury to the business or property of the plaintiff, *i.e.,* there was fact of damage." *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1320 (5th Cir.1976).

The jury's award of no damages on the antitrust claims indicates that they found that the Plaintiffs were not damaged by an antitrust violation. The Court of Appeals for the District of Columbia confronted a similar situation. *See Association of Western Rys. v. Riss & Co.,* 299 F.2d 133, 134–35 (D.C.Cir.) *cert. denied,* 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962). There the jury returned a verdict against the Defendant but did not award any damages. *See id.* The Court of Appeals concluded that the verdict plainly meant that the Defendants conspired but that the conspiracy did not damage the Plaintiff. *See id.* at 135. As a result, the court held that Plaintiff had not proved its claim because it failed to show damages. *See id.*

■ In this matter, the jury's determination of no damages means exactly that. The Court must conclude that Plaintiffs failed to sustain their burden of showing damages to their business or property as a result of an antitrust violation. With this conclusion in mind, the result is preordained. Thus, Plaintiffs have not proved their treble damage antitrust claims and the Defendant is entitled to a judgment notwithstanding the verdict on those claims.

Defendant's second theory is that it is entitled to entry of judgment in its favor as a matter of law on the remaining antitrust claims. Blue Cross argues that there was insufficient evidence to establish antitrust violations because of the prudent buyer policy, selective marketing of HealthMate, and adverse selection policies. Therefore, the Defendant reasons that the Court is required to enter judgment in its favor as a matter of law. A more in depth analysis of prudent buyer, adverse selection, and the selective marketing of HealthMate is needed before conclusions may be drawn on whether they separately or collectively violate antitrust laws.

First, Blue Cross contends that the McCarron–Ferguson Act, 15 U.S.C. §§ 1011–1015, exempted adverse selection and the selective marketing of HealthMate from the antitrust laws. The Defendant claims that adverse selection and Health-Mate constituted the business of insurance regulated by state law; therefore, those programs were exempt under the Sherman Act. On the other hand, Plaintiffs claim health service corporations are not in the business of insurance so they are not eligible for the McCarron–Ferguson exemption

to the antitrust laws. There is substantial support for the Plaintiffs' contention. *See Group Life & Health Ins. Co. v. Royal Drug,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). There is respectable authority to the contrary. *See Health Care Equalization Comm. v. Iowa Medical Soc'y,* 851 F.2d 1020 (8th Cir.1988). However, as it is made clear hereafter there is no need to presently resolve this conflict.

■ The question is whether or not the prudent buyer policy, adverse selection and the selective marketing of HealthMate violate antitrust laws. Plaintiffs must prove the following elements by a preponderance of the evidence:

First, that the Defendant had monopoly power in a relevant market;

Second, that the Defendant willfully acquired or maintained that power through restrictive or exclusionary conduct;

Third, that Defendant's activities occurred in or affected interstate commerce; and

Fourth, that Plaintiff was injured in its business or property because of Defendant's restrictive or exclusionary conduct.

*See, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Forro Precision, Inc. v. Intern. Business Mach. Corp.,* 673 F.2d 1045, 1058 (9th Cir.1982); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272–76 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ The terms "monopoly power" and "market power" are generally used interchangeably. P. Areeda & D. Turner, *Antitrust Law,* § 529 at 388 (1978). "Monopoly power" is the power to control prices or exclude competition in a relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The relevant market is the "area of effective competition" where the defendant operates. *Standard Oil Co. v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949). Relevant market is identified by the product and its interchangeability plus the geographic area. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 399, 76 S.Ct. 994, 1009, 100 L.Ed. 1264 (1956). Usually the trier of fact defines the relevant market. *See International Boxing Club, Inc. v. United States,* 358 U.S. 242, 245, 79 S.Ct. 245, 247, 3 L.Ed.2d 270 (1959).

Blue Cross contended that as between the class of physicians and Blue Cross they are not in the same relevant market. Physicians were not sellers of health insurance and therefore in reality are not head to head competitors of Blue Cross. Without a relevant market existing between Blue Cross and the class of physicians, Blue Cross claimed it could not engage in anticompetitive acts which could harm the class. The only effect if at all on the class due to Blue Cross's actions, it contends is indirect. In addition, Blue Cross hypothesized that even if it possessed 100% share of the health care financing market, the physician class would not have any antitrust claim because it derives only a small portion of its income from Blue Cross insureds. Noting that physicians are paid from many sources including Medicare, Medicaid, commercial insurance carries, self-insured employers, and patients directly, Blue Cross claims that there was no evidence that Blue Cross represented any more than 30% of the dollar purchases of physician services. Thus, it contends, it could not possess monopoly power and could not have engaged in anticompetitive conduct.

Defendants are confusing relevant market with standing to sue. It is not a requirement to an antitrust suit that plaintiff and defendant be in the same relevant market. *See Blue Shield of Va. v. McCready,* 457 U.S. 465, 478–81, 102 S.Ct. 2540, 2547–49, 73 L.Ed.2d 149 (1982). Plaintiff, however, must meet the standing requirement that it allege that it suffered an injury to its business or property as a result of the Defendant's conduct. *See* 15 U.S.C. § 15 (1982). The First Circuit requires that the person injured by the alleged antitrust vio-

lation be within a target area, which draws a line and excludes persons whose injuries are too remote. *See Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 17–19 (1st Cir.1979)

■ The class of physicians have asserted an injury to their business or property as a result of the alleged antitrust violation, i.e. the loss of reimbursement from the SIP's pool because of payments to non-participating physicians. Their alleged injury is within the target area. Thus, the class of physicians have standing to sue even though they may not be participants in the same relevant market as Blue Cross & Blue Shield.

Blue Cross & Blue Shield acquired its market share before Ocean State's creation. The undisputed evidence is that Blue Cross & Blue Shield was for years essentially the sole private health care cost insurer in the State of Rhode Island. Not only did Blue Cross & Blue Shield have a better "mousetrap," it had the only "mousetrap" in town. As time went on, the industry changed with the development of health maintenance organizations. Rhode Island Group Health Association (RIGHA) appeared in 1971. Its physicians were employed by RIGHA and a subscriber was required to select a RIGHA physician. This plan had some disadvantage from the point of view of the subscriber, who heretofore, had been accustomed to free selection of his or her own physician. Ocean State was a natural progression of the Health Maintenance format. It entered into contracts with almost half the physicians in the State of Rhode Island, providing patients with a wider choice of their respective physicians. It is obvious that a natural tension would develop between Blue Cross & Blue Shield and Ocean State and that physicians would seek the continuance of both plans in order that they could contract with both plans. It is not without significance that it was not Blue Cross & Blue Shield customers who have complained. The Plaintiffs are Ocean State and some physicians. The market involved is a market which provides means to finance health care. There is no proof that

competition for physician services has been affected, or that any payment to which a physician is entitled has been lost. The claim is that purchasers of health insurance have been corralled by Blue Cross & Blue Shield to the competitive disadvantage of its competitors. The genesis of this complaint is the response of Blue Cross & Blue Shield to market conditions and the circumstances extant in the spring, summer and fall of 1986.

Both Blue Cross & Blue Shield and Ocean State were facing difficult financial conditions in the spring of 1986. They were both losing money. The largest single contract involving the employees of the State of Rhode Island was due for competitive bids at the end of June 1986. At that time Ocean State had not been able to return the 20% it had retained from its contracted physicians for the calendar year 1985. Thus, Ocean State physicians, who had also contracted with Blue Cross, charged 20% less to Ocean State than the same physicians had charged Blue Cross for precisely the same services. In this mix, Blue Cross & Blue Shield created its Healthmate plan, originally called "Z Plan", "MAPS Plus", and "PLAN 100 PLUS". Blue Cross & Blue Shield's market share permitted it to develop both the prudent buyer policy, adverse selection, and HealthMate.

■ "The connection between market share and market power if far from clear." *See* P. Areeda, *supra* at 328. Size alone does not violate the Sherman Act. *United States v. United States Steel Corp.*, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920). Courts, however, must consider the market share of the alleged monopolist as an important factor in determining the existence of monopoly power. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945). In unregulated industries, courts measure market power by defining the relevant product and geo-

graphic market and compute the defendant's market share. *See Southern Pacific Communications v. American Tel. & Tel.*, 740ᶦ F.2d 980, 1000 (D.C.Cir.1984), (citing (*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)), *cert. denied* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). In a regulated industry, such as health care insurance, a heavy reliance on market share statistics probably would be an inaccurate or misleading indication of monopoly power. *See Southern Pacific Communications*, 740 F.2d at 1000; *MCI Communications Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Thus, the size of a regulated company's market share should be a point of departure in determining the existence of monopoly power. *Id.* at 1107. Other factors such as size of competitors, degree of barriers to entry, pricing trends and practices and technological superiority may be considered in determining market power. *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 96 F.T.C. 650, 762 (1980); *International Distrib. Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786 (2d Cir.1987); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 532–39 (7th Cir.1986). A monopoly power analysis must focus directly on the defendant's ability to control prices or exclude competition. *MCI Communications Corp.*, 708 F.2d at 1107. It is essential to also keep in mind the fact that the antitrust laws were enacted for the protection of competition, not competitors. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

The evidence established that Blue Cross provides in Rhode Island private non-government health care financing for a major market share. It is not contended that because of Blue Cross & Blue Shield's dominant market position, it has charged its customers, the persons insured by Blue Cross & Blue Shield more than they should have been charged. There is no suggestion that Blue Cross & Blue Shield has not obtained the best economic benefit for its subscribers. Indeed, the complaint is at bottom that because of Blue Cross & Blue Shield's market power, it has been able to get a better deal for medical services than Ocean State and that because of its market power, physicians have the awful choice of yielding to its fee schedule or losing their patients who are Blue Cross & Blue Shield subscribers. At the same time the evidence is clear that Blue Cross & Blue Shield face intense competition from Ocean State and RIGHA. Also, insurance companies with national bases are becoming more involved in the Rhode Island market. Large employers have become self insurers. Thus, although Blue Cross & Blue Shield has market power, it is not without limit. There is a competitive market. The argument goes that since so many persons are enrolled in Blue Cross & Blue Shield in the State of Rhode Island what it does must be considered in the context of its market power. So much is true. The question is did it use its obvious market power in an anti-competitive manner? *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *see also United States v. United Shoe Mach. Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

What is anti-competitive activity is not a matter that has been clearly defined. There are some significant signposts along the way, but the route is not so clearly marked that departures are unavoidable. It is blandly stated that "[t]he use of monopoly power, however, lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful under the Sherman Act." 54 Am.Jur.2d § 42, at 692 (citing *Home Placement Service, Inc. v. Providence Journal Co.*, 682 F.2d 274 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75

L.Ed.2d 500 (1983)). But what is the anti-competitive behavior which must be condemned? Theorists have not done much to illuminate the essential elements. Thus, *Areeda* talks in terms of exclusionary conduct not competitive on the merits and not more restraint than reasonably necessary to maintain competition. P. *Areeda, supra* ¶ 655(b) n. at 72–73. Courts have adopted Areeda's definition of exclusionary conduct which includes "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *See, e.g., Aspen Skiing Co.,* 472 U.S. at 605, 105 S.Ct. at 2859 (citing 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626b at 78 (1978)); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983) (citing 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626 at 83 (1978)); *Instructional Sys. Dev. Corp. v. Aetna Cas. and Sur. Co.,* 817 F.2d 639, 649 (10th Cir.1987) (citing 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 625b (1978)).

It is crucial to differentiate "between practices which tend to exclude or restrict competition ... [from practices that result from] the success of a superior product, a well-run business, or luck, on the other [hand].", the very essence of competition. *Aspen Skiing Co.,* 472 U.S. at 604, 105 S.Ct. at 2858. Examples of the effect of competition on the merits are non-exploitative pricing, higher output, improved product quality, energetic market penetration, successful research and development, and cost-reducing innovations. *See Aspen Skiing Co.,* 472 U.S. 585, 105 S.Ct. 2847; *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945). Blue Cross & Blue Shield has historically been very successful. On the other hand, Ocean State's penetration of the market has been phenomenal. With these general principles in mind, the specific aspects of Blue Cross & Blue Shield's adverse selection, HealthMate, and prudent buyer policies must be examined.

Adverse selection is criticized because it is claimed that the number of subscribers who it was estimated would leave Blue Cross was too high. The obvious import of this circumstance would be to increase the cost of Blue Cross & Blue Shield. It is a curious argument indeed by a competitor that Blue Cross & Blue Shield was charging too much for its product. Competitors could hardly be injured by an increase in price. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 583, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986). What is more significant is that no one disputes that adverse selection was a fact. Healthier persons would tend to enroll in an HMO. If they did so, then without doubt Blue Cross & Blue Shield would be left with more expensive subscribers. The dispute posited by Plaintiffs is that fewer subscribers would leave Blue Cross & Blue Shield than Blue Cross & Blue Shield estimated. This is hardly the basis of an antitrust claim. Certainly, business people have some area of reasonable and responsible legitimate judgment. This is such an instance.

HealthMate is the result of research and development which concluded that HMO's will have a major role in health care financing in the future. Although HealthMate is not an HMO, it was Blue Cross's attempt to provide a health care financing plan comparable to an HMO until Blue Cross could establish an HMO program. Antitrust laws support the introduction of new products, such as HealthMate, because it encourages competition. *See Berkey Photo, Inc.,* 603 F.2d at 263. If Blue Cross & Blue Shield were foreclosed by the Sherman Act from competing in an HMO format, the Plaintiff Ocean State would then have the major HMO market share in Rhode Island. This use of the Sherman Act would produce obvious anticompetitive effects.

The selective marketing of HealthMate does not negate the policy reason for encouraging HealthMate. Offering HealthMate as an option to subscribers who are eligible for Ocean State, is head to head competition between Ocean State and Blue Cross and that competition benefits consumers by providing them with alternative health care financing options. It is only because of Ocean State's decision not to

compete that the product is not offered elsewhere. Ocean State seeks, therefore, to benefit from its lack of competitive effort in areas where for reasons to its advantage it decides not to compete.

With respect to the prudent buyer program, Plaintiffs asserted that there was sufficient evidence to show that the prudent buyer program was exclusionary. They contended that the prudent buyer had the purpose and effect of maintaining the Defendant's monopoly power and was not a legitimate money saving policy. Noting the testimony of Ronald Battista, Senior Vice President of Professional Relations at Blue Cross & Blue Shield, that prudent buyer was not designed to produce savings for Blue Cross, Ocean State concluded that prudent buyer had an anticompetitive purpose. Relying on Blair Suellentrop's, Chief Executive Officer of Ocean State, testimony regarding the decline in Ocean State's enrollment and resignation of participating physicians, Ocean State concluded that the prudent buyer policy was instituted to harm Ocean State. Indeed, it was Ocean State who claimed that the testimony of Ronald Battista, Blair Suellentrop, and Douglas McIntosh, Chief Executive Officer of Blue Cross & Blue Shield, established sufficient evidence to show that the prudent buyer program was anticompetitive.

On the contrary, Mr. Battista's and Mr. McIntosh's testimony indicated that prudent buyer was instituted to assure that Blue Cross's payments to physicians were not more than Ocean State's payments to physicians. There was no evidence that securing comparable fees for physician services resulted in any anticompetitive effect or impaired Ocean State's competitive opportunities. That the policy had the effect of harming Ocean State was inevitable, but was from the point of view of the consumer clearly understandable. The harm that came Ocean State's way was the resignation of some of its physicians, and claimed increased costs. This harm has to do with the market for physicians' services and the election by physicians of a course which they considered most beneficial to their financial point of view. As a naked proposition, it would seem silly to argue that a policy to pay the same amount for the same services is anticompetitive, even on the part of one who has market power. This, it would seem, is what competition should be all about.

Relying on *Kartell v. Blue Shield of Mass.*, Defendant claimed that prudent buyer was a legitimate defense under a "most favored nations clause" which was designed to protect Blue Cross from paying more for the same services than competitors. 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985). Blue Cross analogized the prudent buyer policy of this case with the no balance billing policy in *Kartell*. *See id.* In *Kartell*, the First Circuit held that Blue Cross was a purchaser of health services and as such had the right to require participating physicians not to balance bill patients who are Blue Cross subscribers. *Id.* Blue Cross argued that as a purchaser of health services it has a lawful right to bargain with its suppliers, the physicians, for the best possible price terms. Blue Cross is a purchaser of health services. The more Blue Cross's activities resemble a purchaser the less likely that they are unlawful. *See id.* at 925. As a legitimate buyer, Blue Cross is entitled to use its market power to get the best price for the services it purchases. *See id.* at 929. Therefore, the prudent buyer policy is clearly not anticompetitive and does not violate the antitrust laws.

Indeed, if Plaintiffs are correct in their contention that the prudent buyer policy is anticompetitive, it is impossible not to come to the same conclusion regarding Ocean State's SIPS plan. There is no principle of antitrust law which would deny a business practice to any entity with market power and permit that practice on the part of competitor who does not have market power. To hold prudent buyer anticompetitive would have given and would give Ocean State an unfair competitive advantage in the market, a result which is antithetical to the purpose of the Sherman Act and economically detrimental to health care consumers.

■ The Defendant's motion for a judgment notwithstanding the verdict is granted on the antitrust claims. The adverse selection programs, prudent buyer program, and the selective marketing of HealthMate are not anticompetitive and do not violate the antitrust laws. There can be no conclusion other than that these programs benefit consumers and represent legitimate responses to competitive conditions.

## ADDITUR

■ The physicians' class seeks a $1.9 million dollar additur on the antitrust claim. Relying on the testimony of Thomas Aman and Ronald Battista, Defendant's witnesses, who both testified that Blue Cross retained at least $1,900,000 from Ocean State participating physicians and the physicians' class who claimed that Blue Cross retained $1,900,000 from Ocean State participating physicians, Plaintiffs concluded that there was no valid dispute concerning the Blue Cross withhold. Therefore, the $1,900,000 that Blue Cross withheld may be considered as the damage for the antitrust violation. In light of the jury's verdict and the Court's determination of the Defendant's motion for judgment notwithstanding the verdict on the antitrust claim, Plaintiffs' motion for additur must be denied.

## INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

Next, it is necessary to determine whether the prudent buyer, adverse selection, or the selective marketing of HealthMate interfere with the contractual relationships between Ocean State and its participating physicians. Plaintiffs claimed that Ocean State and the class of physicians incurred damages under their contracts due to the Defendant's actions. Ocean State argued that its advertising budget had to be increased beyond what it expected to spend and above the average advertising expenditures for HMO of its size. Ocean State claimed it incurred additional advertising expenses of $335,000 due to Blue Cross & Blue Shield's actions and the subsequent negative publicity. In addition, Ocean State claimed that it lost profits of $173,013 because prospective members did not enroll due to the Defendant's actions. Ocean State, also, contended that it incurred unbudgeted expenses of up to $1,053,740 to retain physicians in certain specialties. The jury did not award any of these claimed damages to Ocean State.

The class of physicians claimed that the money Blue Cross & Blue Shield withheld caused the class to suffer damages. In addition, plaintiffs contended that the class of physicians lost $946,760, which represented the additional moneys Ocean State paid to non-participating specialists. These damages were erroneously awarded to Ocean State.

Defendant claimed that it did not interfere with Ocean State's contractual relationships with the class of physicians. It asserted that there was no evidence that any act by Blue Cross & Blue Shield made more difficult the performance of the Ocean State contracts or lessened their value. Blue Cross & Blue Shield, also, contended that the class' contracts were not terminated, breached, or altered in any sense.

The Defendant argued that the jury awards on the interference with contractual relationships were not based on evidence. Furthermore, Defendant claimed that the $947,000 the jury awarded Ocean State represented lost payments to the physicians' class and that Ocean State never claimed that amount as its damages. Therefore, the Defendant contended that the evidence does not support an award of $947,000 to Ocean State.

Blue Cross & Blue Shield argued that the $1,746,437 awarded to the class of physicians represented Blue Cross & Blue Shield's estimated savings through the prudent buyer plan for an eight month period. It did not represent the damages to the class of physicians. The Defendant's contentions have substantial basis. Although the class claims that the $1,746,437 equals its damages the class ignores the fact that many physicians who are not in the class were among those from whom full pay-

ment was withheld. The Defendant further contends that there was no evidence from which a reasonable jury could award any damages.

The Rhode Island Supreme Court defined the basic elements of a claim for tortious interference with contractual relationships in *Smith Dev. Corp. v. Bilow Enter. Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). Later cases have adopted these elements for a claim of tortious interference with prospective contractual relationships. *See, e.g., Roy v. Woonsocket Inst. for Sav.*, 525 A.2d 915, 919 (R.I.1987); *Mesolella v. City of Prov.*, 508 A.2d 661, 670 (R.I.1986); *Federal Auto Body Works, Inc. v. Aetna Cas. & Sur. Co.*, 447 A.2d 377, 380–81 (R.I.1982). Plaintiff must prove by the preponderance of the evidence that a contract existed, that the alleged wrongdoer knew of the contract, that the wrongdoer's interference was intentional, and that damages resulted from it. *Smith Dev. Corp.*, 112 R.I. at 211, 308 A.2d at 482. The Plaintiff must show that the Defendant intended to do harm without justification. *Mesolella*, 508 A.2d at 670. The Defendant has the burden of proving sufficient justification for an interference. *Smith Dev. Corp.*, 112 R.I. at 211, 308 A.2d at 482.

The Plaintiffs have met their burden of proving that contracts existed between Ocean State and Ocean State participating physicians and that Blue Cross knew of these contracts. The Plaintiffs, however, have failed to present any evidence that Blue Cross intentionally interfered with the contracts by implementation of the prudent buyer program, adverse selection, and the selective marketing of HealthMate. The only evidence was that some physicians perceived it to be to their economic advantage to terminate their relationship with Ocean State in accord with the terms of their agreement with Ocean State because of the prudent buyer policy. Translating this circumstance into an intentional interference by Blue Cross & Blue Shield with a contractual relationship is quite clearly absurd. Blue Cross & Blue Shield announced what it was willing to

pay. Some physicians, not willing to give Blue Cross & Blue Shield a discount, resigned from Ocean State as permitted by their contract with Ocean State. There is no evidence of intentional interference with the contracts between the class of physicians and Ocean State. Further, prudent buyer, adverse selection, and the selective marketing of HealthMate were justified courses of action that Blue Cross undertook as appropriate competition so that its subscribers would not be further burdened. Absent these programs, Blue Cross would pay more to the same physicians for their services than Ocean State. Blue Cross & Blue Shield would be subject to additional expense because of healthier subscribers transferring to an HMO because Blue Cross subscribers would lack a program comparable to Ocean State's coverage. It is obvious that Blue Cross acted with justification and therefore, the prudent buyer policy, adverse selection, the selective marketing of HealthMate were without doubt, justified responses to competitive conditions. Defendant's motion for judgment notwithstanding the verdict on the interference of contractual relationships must be and is granted.

Further, the jury verdict that Defendant was liable on the claim of tortious interference with contractual relationships was against the clear weight of the evidence that Blue Cross justifiably instituted the prudent buyer policy, adverse selection, and the selective marketing of HealthMate. Also, the damages awarded by the jury were inappropriate. A new trial is required to prevent injustice. Giving full respect to the jury's determination, the Court is left with the firm conviction that a mistake has been committed in that damage amounts have been awarded to parties who are not entitled to them. Therefore, Defendant's motion for a new trial on the intentional interference with contractual relationships is also granted.

### INJUNCTIVE RELIEF

Plaintiffs and Defendant seek injunctive relief. Plaintiffs move to enjoin Blue Cross from continuing the prudent buyer pro-

gram or implementing a similar program and to restrain the marketing of Health-Mate. The Defendant moves to enjoin the Plaintiff–Intervenors from engaging in the illegal practices alleged and to restrain the Physician and Surgeons Association of Rhode Island, Inc. from negotiating or attempting to negotiate collectively physician fees with Blue Cross.

■ Although Plaintiffs and Defendant seek equitable relief for different purposes, the burdens of proof are the same for each moving party. Congress enacted Section 16 of the Clayton Act to permit private actions for equitable relief. 15 U.S.C. § 26 (Supp.1988). Section 16 of the Clayton Act, reads in part: "[a]ny person ... [or] corporation ... shall be entitled to sue for injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage ..." 15 U.S.C. § 26. (Supp.1988). Injunctive relief is available to private parties when the traditional equity principles are met and there is a demonstration of a threatened injury. *See, e.g., Hawaii v. Standard Oil Co.,* 405 U.S. 251, 260, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 407–08 (1st Cir.1985). The traditional elements that a moving party must show for injunctive relief are: 1) irreparable harm to the Plaintiff if the injunction is not granted, 2) inadequacy of a legal remedy, 3) that the public interest will not be adversely affected by granting the injunction; 4) that the harm to Plaintiff outweighs any harm to the Defendant by granting the injunction. But in order to prevail, Plaintiff must "demonstrate a significant threat of injury from an impending violation of the antitrust laws." *See id.* 395 U.S. at 130, 89 S.Ct. at 1580. Plaintiff need only show a threat of injury not an actual injury. *See Zenith Radio Corp.,* 395 U.S. at 130, 89 S.Ct. at 1580; *Cia. Petrolera Caribe, Inc.,* 754 F.2d at 407–08.

■ Plaintiffs have failed to show that adverse selection, the prudent buyer policy, or HealthMate have threatened loss or damage to their business or property because of violations of the antitrust laws for the reasons heretofore stated. Therefore, Plaintiffs' motion for a permanent injunction against prudent buyer policy and HealthMate is denied.

■ With respect to the Defendant's counterclaim for injunctive relief, it is premature. There is no evidence that the Plaintiff–Intervenors or their officers, directors, agents, or employees engaged in any illegal practice. Furthermore, there is no evidence that the Physicians and Surgeon Association of Rhode Island negotiated or attempted to negotiate collectively with Blue Cross concerning physicians' fees. Thus, Defendant's motion for a permanent injunction against the Plaintiff–Intervenors is denied.

## DECLARATORY RELIEF

Plaintiffs also seek a declaratory judgment against the alleged acts which violate the Sherman Act. Defendant seeks a declaratory judgment against the Plaintiff–Intervenors from collectively negotiating fees to be paid by Blue Cross. The nature of the parties' claims is equitable. In light of the Court's previous ruling on the equitable claims, the Court denies declaratory relief to Plaintiffs and Defendant.

## CONCLUSION

Defendant's motion for judgment notwithstanding the verdict is granted on both the antitrust claims and the interference with contractual relationships claims. Defendant's motion for a new trial is granted on the claims of intentional interference with contractual relationships. Plaintiffs' motion for additur is denied because there is no antitrust violation. Plaintiffs' motion for a permanent injunction against the prudent buyer program and HealthMate is denied because Plaintiffs' failure to show a prospective injury. The Defendant's coun-

terclaim against the Plaintiff–Intervenors is denied because it is premature.