**OCEAN STATE PHYSICIANS HEALTH PLAN, INC., et al., Plaintiffs, Appellants,**

v.

**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, Defendant, Appellee.**

No. 88–1851.

United States Court of Appeals, First Circuit.

Heard April 5, 1989.

Decided Aug. 21, 1989.

Stuart M. Gerson with whom William G. Kopit, Epstein, Becker & Green, P.C., Washington, D.C., Thomas E. Lynch and Lynch and Greenfield, Providence, R.I., were on brief, for plaintiffs, appellants.

Steven E. Snow with whom James E. Purcell, Partridge, Snow & Hahn, Elia Germani, Providence, R.I., Joshua F. Greenberg, Michael Malina, and Kaye, Scholer, Fierman, Hays & Handler, New York City, were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CAFFREY,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiffs, Ocean State Physicians Health Plan, Inc. ("Ocean State") and a certified class of Ocean State's participating physicians, brought suit against Blue Cross & Blue Shield of Rhode Island ("Blue Cross"), alleging that Blue Cross had acted unlawfully to exclude Ocean State from the health care insurance marketplace. A jury found that Blue Cross was guilty of violating section 2 of the Sherman Act, 15 U.S.C. § 2 (1982) and also was liable under Rhode Island common law for tortiously interfering with the contractual relationships between Ocean State and the physicians. The district court subsequently ruled, however, that the challenged conduct was legitimate competitive activity of a sort that is favored—not prohibited—by the antitrust laws. Accordingly, the court granted judgment notwithstanding the verdict to Blue Cross on both the antitrust and tortious interference claims. We affirm the district court's judgment.

I. FACTUAL BACKGROUND

Defendant Blue Cross, a non-profit corporation established in 1939, has long been the largest health insurer in Rhode Island. It purchases health services from physi-

* Of the District of Massachusetts, sitting by designation.

cians, hospitals, and other health care providers on behalf of its subscribers. Blue Cross underwrites the cost of these purchases by spreading the risk of health care expenses among its subscriber groups. Plaintiff Ocean State is a for-profit health maintenance organization ("HMO") that began operations in 1984. Like Blue Cross, Ocean State contracts with physicians to provide medical care to its subscribers, and then pays its contracted physicians on a fee-for-service basis. While Blue Cross will reimburse its subscribers even for certain services performed by non-participating physicians, Ocean State does not pay for services by non-participating physicians. Eighty percent of the shares of the Ocean State corporation are owned by its participating physicians. A physician may participate in more than one health insurance program. Thus, a physician may contract with Blue Cross, with Ocean State, or with both.

From its inception, Ocean State grew rapidly. Like Blue Cross, it was offered to subscribers through employers. Apparently because Ocean State provided more coverage and charged lower premiums, many subscribers switched from Blue Cross to Ocean State. By the spring of 1986, Blue Cross had lost approximately 30,000 of its 543,015 enrollees, while Ocean State's enrollment had exceeded all expectations, growing to 70,000. *See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 692 F.Supp. 52, 57 (D.R.I.1988). Because Blue Cross was experiencing financial problems, it had to raise its premiums in order to maintain adequate financial reserves. As it raised its premiums, it lost more enrollees—which, in turn, forced further rate increases. In short, Blue Cross "was faced with a serious competitive problem." *Ocean State,* 692 F.Supp. at 57.

In the spring of 1986, to meet the challenge presented by Ocean State, Blue Cross instituted a three-pronged attack:

First, Blue Cross launched its own HMO "look-alike," dubbed HealthMate, which it marketed to employers who were offering the Ocean State plan to their employees. Like Ocean State, HealthMate provided 15 percent more coverage than the standard Blue Cross plan, including such added benefits as office visits, prescription drugs, and "good health" benefits. Like Ocean State, but unlike traditional Blue Cross, HealthMate paid only for services provided by participating physicians. In those employer groups in which employees were required to contribute to their premiums, HealthMate was offered at 5 percent below the cost of traditional Blue Cross. 692 F.Supp. at 58.

Second, Blue Cross instituted an "adverse selection" policy of pricing. "Adverse selection" refers to the tendency for younger and healthier people to opt for HMOs such as Ocean State when they are made available, leaving older and sicker people (on the average) in the standard Blue Cross pool. Because of such adverse selection, Blue Cross expected the health care costs for standard Blue Cross to be higher in those employer groups that offered an HMO option than in those employer groups that did not. With the approval of the Rhode Island Department of Business Regulation ("DBR"), Blue Cross instituted a pricing plan that took account of this projected difference in health expenses.[1] Under this policy, employers were offered three different rates for traditional Blue Cross coverage. The rate was lowest for an employer who offered *only* traditional Blue Cross, intermediate for an employer who also offered a competing HMO (usually Ocean State) and HealthMate, and highest for an employer who also offered a competing HMO but declined to offer HealthMate.

Third, Blue Cross initiated a policy, which it called "Prudent Buyer," of not paying a physician more for any service or procedure than that physician was accepting from any other health care cost provid-

---

1. Blue Cross established the adverse selection policy in June 1986, without approval from DBR. In October 1986, DBR ordered Blue Cross to suspend the policy until it obtained DBR approval. On November 12, 1986, the DBR approved Blue Cross's rate formula, and Blue Cross resumed its use.

er (such as Ocean State). Blue Cross established this policy after it became apparent that Ocean State's contracting physicians were accepting about 20 percent less for their services from Ocean State than they were receiving from Blue Cross. Ocean State had withheld 20 percent of its physicians' fees in 1985, with the expectation that if the corporation made a profit the withhold would be returned. Ocean State did not turn a profit, however, and the withhold was not returned. In 1986 Ocean State again withheld 20 percent of its physicians fees, which it again failed to return after the end of the year. In order to ensure that it was getting the physicians' best prices, Blue Cross required each of its participating physicians to certify that he or she was not accepting any lower fees from other providers than he or she was receiving from Blue Cross for the same service. If the provider failed to provide such certification, Blue Cross reduced that physician's fees by 20 percent. As a result of the Prudent Buyer policy, Blue Cross achieved significant cost savings. After the implementation of Prudent Buyer, about 350 of Ocean State's 1200 physicians resigned, in many cases apparently in order to avoid a reduction in their Blue Cross fees.

## II. PROCEDURAL BACKGROUND

Ocean State, together with a certified class of its participating physicians, brought this suit against Blue Cross. Ocean State [2] alleged that Blue Cross's conduct violated, inter alia, section 2 of the Sherman Act, which makes it unlawful to "monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2.[3] Ocean State charged that Blue Cross launched HealthMate not because it was a viable long-term product, but in order to put Ocean State out of business. Through the adverse selection policy, Ocean State claimed, Blue Cross was able to raise its rates for standard Blue Cross for employer groups offering HealthMate—which, in turn, influenced employers not to make HealthMate available.[4] Finally, Ocean State claimed that Blue Cross instituted the Prudent Buyer policy not in order to save money, but rather to induce physicians to resign from Ocean State. Plaintiffs also raised a pendent state law claim: that Blue Cross's conduct tortiously interfered with the contractual

---

**2.** Here and at other points in this opinion we use the term "Ocean State" to refer collectively to both plaintiffs—Ocean State itself and the class of participating physicians.

**3.** Under section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), any person injured by such unlawful monopolization may bring suit for treble damages, and under section 16 of the Clayton Act, 15 U.S.C. § 26 (1982), any person threatened with such injury may sue for injunctive relief.

Ocean State also claimed that Blue Cross had violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), which prohibits contracts, combinations, and conspiracies in restraint of trade. Ocean State alleged that Blue Cross had violated section 1 by (1) attaining monopoly power through a merger between Blue Cross and Blue Shield in 1982, and (2) conspiring with the Rhode Island Group Health Association ("RIGHA"), the only HMO operating in Rhode Island before 1984, to control hospital discounts. At the close of the plaintiffs' case, the district court directed a verdict in favor of Blue Cross on the section 1 claims. The court ruled that there was no evidence that the Blue Cross–Blue Shield merger had an anticompetitive effect, and that there was no evidence that plaintiffs were injured as a result of the agreement be-

tween Blue Cross and RIGHA. Ocean State does not seriously challenge this directed verdict on appeal. In a footnote to its brief, Ocean State suggests only that if this court were to order a new trial on antitrust matters, plaintiffs should be entitled to press their section 1 claims. At oral argument, Ocean State's counsel said that it had addressed the section 1 claims "en passant." This "en passant" presentation did not suffice to preserve the section 1 issue on appeal, and therefore we will not consider it further.

**4.** It might seem incongruous at first blush for Ocean State to allege that Blue Cross engaged in anticompetitive behavior by *raising* its rates. Such allegations of anticompetitive conduct are usually reserved for cases in which companies *lower* their rates, incurring short-term losses for the purpose of undercutting competitors and putting them out of business. Here, however, Ocean State argues plausibly that many employers felt committed to offer Blue Cross to their employees. Since their Blue Cross rates would increase if they also offered Ocean State, these employers allegedly felt pressure not to adopt (or to drop) Ocean State in order to keep their Blue Cross rates down. The personnel manager of one company testified to this effect at trial.

relationships between Ocean State and the members of the class of Ocean State physicians.

· After a lengthy trial, the jury found Blue Cross "guilty" on the section 2 claim, but it awarded no damages on this claim. The jury also found that Blue Cross had tortiously interfered with plaintiffs' contractual relationships. On the latter claim it awarded the Ocean State Physicians Health Plan $947,000 in compensatory damages and $250,000 in punitive damages; and it awarded the members of the physician class $1,746,437 in compensatory damages. Following the verdict, Blue Cross moved for judgment notwithstanding the verdict on both claims and, in the alternative, for a new trial on the tortious interference claim. Ocean State, for its part, moved for an injunction against Blue Cross's continuation of the challenged policies, as well as for a $1.9 million additur to the jury award to the physician class.

In its opinion, 692 F.Supp. at 74, the district court granted Blue Cross's motion for judgment notwithstanding the verdict on both the antitrust and tortious interference claims. The court reached its result with respect to the antitrust claims on alternative grounds. First, the court reasoned that the jury's award of "no damages" on the antitrust claim meant that plaintiffs had failed to prove that they had been injured by any illegal conduct by Blue Cross. Second, the court held that, quite aside from the "no damages" verdict, Ocean State plaintiffs had failed to show that Blue Cross's actions were anything other than legitimate acts of competition. Having determined that Blue Cross had not violated the antitrust laws, the district court also granted Blue Cross judgment notwithstanding the verdict on the state law claim of interference with contractual relationships. The court noted that Blue Cross's policies were *"justified* responses to competitive conditions," *id.* at 73 (emphasis added), and therefore could not as a matter of law constitute tortious interference with contractual relationships. In light of these conclusions, the district court also denied Ocean State's motions for injunctive relief and for an additur. Ocean

State appeals from these rulings of the district court.

## III. STANDARD OF REVIEW

In ruling on a defendant's motion for judgment notwithstanding the verdict, the district court must evaluate the evidence in the light most favorable to plaintiffs. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989 (1st Cir.1978). "The motion is properly granted only when, as a matter of law, no conclusion but one can be drawn." *Id.* at 990. We adopt the same standard in reviewing the district court's judgment. At the same time, we note that "the trial court as well as this court has an obligation to render judgment as a matter of law when it is clear from the evidence that such is required." *United States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir.1984).

## IV. THE ANTITRUST CLAIM

In addressing Ocean State's antitrust claim, we first consider the effects on that claim of the jury's "guilty/no damages" verdict. We decline to utilize the jury's failure to award damages as a basis for upholding the lower court's entry of judgment notwithstanding the verdict for Blue Cross. We then consider the applicability of the McCarran–Ferguson Act, which under certain circumstances exempts the "business of insurance" from the antitrust laws. We conclude that by reason of McCarran–Ferguson both HealthMate and the adverse selection policy are exempt from antitrust scrutiny. Finally, we consider whether the Prudent Buyer policy can as a matter of law be found to be an instance of prohibited monopolization, rather than legitimate competitive activity, and we conclude that it cannot.

### A. *The "Guilty/No Damages" Verdict*

As a general rule, a verdict of liability with no damages may require that judgment be entered for the defendant. This court has held, for example, that when a jury found in favor of the plaintiff but assessed "zero" damages under a state automobile dealers act and related tort and

contract claims, the "plaintiff ha[d] failed to establish an essential part of its proof [*i.e.*, a showing of damages], and judgment should have been entered for defendant." *Poulin v. Chrysler Corp.*, 861 F.2d 5, 7 (1st Cir.1988) (citing *Association of Western Railways v. Riss & Co.*, 299 F.2d 133, 135 (D.C.Cir.), *cert. denied*, 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962)). In *Western Railways*, similarly, the court held that defendants were entitled to judgments on claims raised under sections 1 and 2 of the Sherman Act because, although the jury had found "for" the plaintiff, it awarded no damages.

Despite this general rule, however, we hesitate to affirm the district court's judgment on the ground that the jury found Blue Cross "guilty" but did not award damages. The instant case presents two difficulties to that approach which—while we do not decide—cause us to turn elsewhere.

■ First, the present plaintiffs—unlike the plaintiff in *Poulin*—sought not only damages, but also injunctive relief. In a case of this sort, involving prayers for both damages and injunctive relief, a jury finding of liability is ordinarily a prerequisite to the court's equitable consideration of injunctive relief. *See Beacon Theatres, Inc., v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (order of trial must be arranged so that any issues common to a legal claim and an equitable claim are tried to a jury first, with the equitable claim resolved subsequently in light of the determination of the jury). But a finding of damages is not a necessary prerequisite to injunctive relief in a case like the present one. Section 4 of the Clayton Act, 15 U.S.C. § 15, under which Ocean State sought treble damages, requires proof of *"some* damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) (emphasis added). But section 16 of the Clayton Act, 15 U.S.C. § 26, under which plaintiffs sought injunctive relief, requires only *"threatened* loss or damages by a violation of the antitrust laws" (emphasis added). *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986) ("§ 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage"). Under this standard, a finding of actual damages may not necessarily be required. *Cf. Home Placement Service, Inc. v. Providence Journal Co.*, 573 F.Supp. 1423 (D.R. I.1983), *rev'd in part on other grounds*, 739 F.2d 671 (1st Cir.1984), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985) (granting permanent injunction to prevent future antitrust violations, despite a damages award of only $3 in nominal damages). Therefore, the jury finding of liability but no damages on the antitrust claim arguably requires the lower court to consider awarding injunctive relief. If so, for us to determine whether or not the district court erred in denying Ocean State's motion for an injunction, we must deal first with the merits of the jury's finding of antitrust liability.

Second, although the jury awarded "no damages" on the antitrust claim, it awarded substantial damages to Ocean State and the physicians on the pendent state claim of interference with contractual relationships. Blue Cross and Ocean State agree that the antitrust and tortious interference claims were based on the same pattern of conduct. Moreover, the jury had evident difficulty in deciding how to allocate the damage award between the two claims. Common sense suggests that under these circumstances, the damage award for tortious interference may have represented the jury's assessment of antitrust injury as well.[5] To the extent that this is likely, a

---

5. The jury initially awarded *each* plaintiff, Ocean State and the physician class, compensatory damages of $2,693,437 and punitive damages of $250,000, undifferentiated as to claim. Noting that Ocean State and the physicians allegedly suffered distinct injuries, the court instructed the jury that it must award damages separately for each plaintiff and for each claim.

After further deliberation, the jury awarded Ocean State compensatory damages of $947,000 and punitive damages of $250,000 and awarded the physicians compensatory damages of $1,746,437. But the verdict forms did not indicate whether the awards were for damages on the antitrust claim, the tortious interference claim, or both. The district court then instruct-

new trial might be necessary in order to rule out the possibility that the jury's verdict was a product of confusion. By dealing with the finding of antitrust liability on its merits, we are able to avoid this problem. We turn, therefore, to the question whether, as a matter of law, an antitrust verdict in plaintiffs' favor could permissibly stand.

B. *The Effect of the McCarran–Ferguson Act*

■ The McCarran–Ferguson Act ("the Act"), 15 U.S.C. §§ 1012(b), 1013(b), exempts from the antitrust laws all conduct that is (1) part of the "business of insurance"; (2) "regulated by State law"; and (3) not in the form of "boycott, coercion, or intimidation." Blue Cross argued to the district court that both the introduction of HealthMate and the use of the adverse selection rate factors—but not the Prudent Buyer policy—were exempted from antitrust scrutiny by the Act.[6] The district court declined to rule on this argument. We find, however, that the McCarran–Ferguson exemption applies both to Health-Mate and to the use of the adverse selection factors.

1. *The "business of insurance."* The central issue with respect to the applicability of the McCarran–Ferguson Act is whether HealthMate and adverse selection are part of the "business of insurance." 15 U.S.C. § 1012(b). The Supreme Court has identified "three criteria relevant in determining whether a particular practice is part of the 'business of insurance' exempted from the antitrust laws":

*first,* whether a particular practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). *See also Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 210–17, 99 S.Ct. 1067, 1072–76, 59 L.Ed.2d 261 (1979). The Court went on to note that "none of these criteria is necessarily determinative in itself." *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3008.

Both HealthMate and the adverse selection policy qualify as the "business of insurance" under these criteria. HealthMate is an insurance policy which operates by spreading policyholders' risk; adverse selection is a pricing policy that inherently involves risk-spreading. Both HealthMate and adverse selection directly involve the relationship between the insurer (Blue Cross) and the insured (its policyholders). Such policies are, more or less by definition, limited to entities in the "insurance industry" as broadly construed. *Accord Health Care Equalization Committee v. Iowa Medical Society,* 851 F.2d 1020, 1029 (8th Cir.1988).

Ocean State argues that "service benefit plans," such as Blue Cross, should not be deemed insurers for McCarran–Ferguson purposes. It bases this argument on a misreading of *Royal Drug,* 440 U.S. 205, 99 S.Ct. 1067. In that case, the Supreme

---

ed the jury that it must specify the claims upon which it awarded damages. Finally, on its third try, the jury awarded "no damages" on the antitrust claim and the same damages as on the second verdict form on the tortious interference claim. In light of the jury's evident difficulty in apportioning the damages between the two claims, it is altogether possible that the jury viewed the damages as stemming from *both* the antitrust violations and the tortious interference. Inasmuch as the jury had been instructed that it could not award damages twice for the same injury, it could not assign the damages to both claims. The jury was not instructed—as perhaps it should have been—that it could as-

sign the same amount to each claim, with the proviso that any award reflecting the overlapping of the two claims was to be made once, not twice.

**6.** On this appeal Blue Cross presses its argument with respect to the use of the adverse selection factors, but not with respect to HealthMate. But Blue Cross raised the issue with respect to HealthMate in the court below, and Ocean State responded to the argument with respect to HealthMate in its appellate brief. Therefore, we do not think that the argument with respect to HealthMate has been waived.

Court characterized Blue Shield's contacts with its *health care providers* as "merely arrangements for the purchase of goods and services by Blue Shield." *Id.* at 214, 99 S.Ct. at 1074. But the Court took care to distinguish Blue Shield's provider contracts from its subscriber contracts:

> This is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements ..., may not be the 'business of insurance' within the meaning of the [McCarran–Ferguson] Act.

*Id.* at 230 n. 37, 99 S.Ct. at 1082 n. 37. This distinction was emphasized in Justice Brennan's dissenting opinion:

> Neither the Court ... nor the parties challenge the fact that the ... policy offered by Blue Shield to its policyholders—as distinguished from the contract between Blue Shield and the [providers] —is the "business of insurance." Whatever the merits of scholastic argument over the technical definition of "insurance," the policy both transfers and distributes risk. The policyholder pays a sum certain—the premium—against the risk of the uncertain contingency of illness, and if the company has calculated correctly, the premiums of those who do not fall ill pay the costs of benefits above the premiums of those who do.

*Id.* at 239, 99 S.Ct. at 1087 (Brennan, J., dissenting) (citation omitted).

Since *Royal Drug*, the focus of the McCarran–Ferguson inquiry has been the nature of the conduct alleged to violate the antitrust laws, not whether the defendant is a traditional insurance company.[7] Accordingly, contracts between a Blue Cross plan and its subscribers have been found to be the "business of insurance" within the meaning of the Act. *See Health Care Equalization Committee*, 851 F.2d at 1020, 1028; *Anglin v. Blue Shield of Virginia*, 693 F.2d 315, 317–20 (4th Cir.1982).

Ocean State also argues that Blue Cross's marketing and pricing practices with respect to HealthMate do not in themselves have the effect of transferring or spreading the policyholder's risk. But inasmuch as a health insurance policy is itself part of the "business of insurance," *see, e.g., Health Care Equalization Committee*, 851 F.2d 1020, 1028; *Anglin*, 693 F.2d 315, 317–20, we believe that the marketing and pricing of such policies are also part of the same business. The exemption offered to state-regulated insurance activities by the McCarran–Ferguson Act would be thin indeed if it were deemed to cover the content of policies, but not the marketing and pricing activities which necessarily accompany these policies. Indeed, in *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969), the Supreme Court noted that "the fixing of rates" and "[t]he selling and advertising of policies" are part of the "business of insurance" under the McCarran–Ferguson Act.

We conclude, therefore, that both HealthMate and adverse selection are part of the "business of insurance" under the McCarran–Ferguson Act.

2. *Regulation by state law.* Turning to the second requirement for exemption under the Act, it is clear that both HealthMate and the adverse selection policy were "regulated by state law." The Rhode Island Department of Business Regulation approved the marketing of HealthMate, as well as the adverse selection rating formula. Ocean State protests that DBR did not approve the specific elements of HealthMate and adverse selection that Ocean State is challenging—for example, the decisions as to where and at what price to offer HealthMate, and the specific projections (which were plugged into the adverse selection formula) of the number of employees who would switch from standard Blue Cross to HMOs. In demanding this level

---

7. For this reason, Ocean State's observation that under Rhode Island law Blue Cross is considered not to be "part of the insurance industry," *Hospital Service Corp. v. West*, 112 R.I. 164, 178, 308 A.2d 489, 497 (1973), is not dispositive. Whether or not Blue Cross is considered to be "in the insurance business" for certain purposes, the challenged *activities* still constitute "the business of insurance." "The exemption is for the 'business of insurance,' not the 'business of insurers.'" *Royal Drug*, 440 U.S. at 211, 99 S.Ct. at 1073.

of specificity, however, Ocean State misinterprets the provision of the Act that limits the exemption to conduct that is "regulated by State law." 15 U.S.C. § 1012(b). The Supreme Court has suggested that this requirement is satisfied by general standards set by the state. *See Federal Trade Commission v. National Casualty Co.*, 357 U.S. 560, 564–65, 78 S.Ct. 1260, 1262, 2 L.Ed.2d 1540 (1958). As the Fourth Circuit has put it more recently, "A body of state law which proscribes unfair insurance practices and provides for administrative supervision and enforcement satisfies the state regulation requirement of the exemption." *Mackey v. Nationwide Insurance Cos.*, 724 F.2d 419, 421 (4th Cir.1984) (citing *FTC v. National Casualty Co.*).[8]

3. *"Boycott, coercion, or intimidation."* The McCarran–Ferguson Act specifically excepts from the exemption any "act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b) Ocean State argues in its reply brief that "the very purpose of the adverse selection factors was to coerce employers not to offer Ocean State or, failing that, at least to coerce employers into also offering HealthMate whenever Ocean State was offered." We

do not believe, however, that this amounts to an allegation of "coercion" under the meaning of the Act.[9] Although Blue Cross may have tried to lure employers and individual subscribers from Ocean State to HealthMate, Ocean State does not point to any evidence that any employer was *coerced* to offer HealthMate or not to offer Ocean State. Even the one personnel manager who testified that the adverse selection policy served to dissuade his company from offering Ocean State did not suggest that the policy left him no choice in the matter. He merely faced rate increases that were somewhat greater than they otherwise would have been.[10]

We conclude that the challenged actions of Blue Cross with respect to HealthMate and adverse selection are exempt from antitrust scrutiny under the McCarran–Ferguson Act.

## C. *The Prudent Buyer Policy*

 The Prudent Buyer policy involves Blue Cross's relationships not with its subscribers but with its provider physicians. Blue Cross makes no claim that this policy is protected by the McCarran–Ferguson ex-

---

**8.** Ocean State also argues that the adverse selection policy is not exempted by the McCarran–Ferguson Act because Blue Cross began using the adverse selection formula before state approval was obtained. *See* note 2, *supra.* But this lapse on Blue Cross's part has little bearing on whether the use of the adverse selection factors was "regulated by state law." It was precisely because of the presence of a comprehensive state regulatory system that DBR was able to order Blue Cross to suspend its use of the adverse selection formula, and Blue Cross did not resume its use until after DBR approval was obtained.

**9.** Much of the case law interpreting the provision focuses upon the "boycott" rather than the "coercion, or intimidation" aspect of the exception. *See, e.g., St. Paul Fire and Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). Coercion has not generally been interpreted to include situations where options have not been entirely closed off to the allegedly coerced parties, even though such options may have been made more expensive. In *Klamath–Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir. 1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983), for example, the requirement by a nonprofit provider of health insurance and health care services that its insureds use the

provider's pharmacy to receive the pharmacy benefits under its policies did not amount to an attempt to boycott, coerce, or intimidate other pharmacies where the provider did not preclude its insurers from patronizing other pharmacies. *See also Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928 (9th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984) (agreement between county medical association and medical malpractice insurers to offer malpractice insurance only to association members was not an agreement to boycott or coerce physicians to purchase carriers' insurance).

**10.** In any event, Ocean State has waived the coercion argument. At trial, although the district court declined to rule on whether Blue Cross's conduct was covered by the McCarran–Ferguson exemption, it did rule that the exception did not apply, noting that "[t]here's no evidence of boycott, intimidation or otherwise." Ocean State apparently objected to this ruling but failed to take exception to it in its initial brief on appeal. It made no argument that Blue Cross's conduct took the form of coercion within the meaning of the McCarran–Ferguson Act. Ocean State's resurrection of this argument in its reply brief comes too late.

emption. *Cf. Royal Drug*, 440 U.S. 205, 99 S.Ct. 1067 (contracts between Blue Shield and participating pharmacies are not exempted from antitrust scrutiny). We agree with the district court, however, that the Prudent Buyer policy—through which Blue Cross ensured that it would not pay a provider physician any more for any particular service than she was accepting from Ocean State or any other private health care purchaser—is, as a matter of law, not violative of section 2 of the Sherman Act.

Section 2 of the Sherman Act makes it unlawful to "monopolize ... any part of the trade or commerce among the several states." 15 U.S.C. § 2. The offense of monopolization has two elements:

> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). On this appeal, Blue Cross does not dispute its monopoly power in the market for health care insurance in Rhode Island. Ocean State, for its part, concedes that Blue Cross acquired its historical advantages legitimately. The issue in dispute is whether Blue Cross *maintained* its monopoly position through improper means.

Section 2 does not prohibit vigorous competition on the part of a monopoly. To the contrary, the primary purpose of the antitrust laws is to encourage competition. *See, e.g., Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231, 248–49, 71 S.Ct. 240, 249–50, 95 L.Ed. 239 (1951). What section 2 *does* prohibit is "exclusionary" conduct by a monopoly, often defined as "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626b at 78 (1978, *quoted by Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 2859 n. 32, 86 L.Ed.2d 467

(1985). To decide whether the Prudent Buyer policy can reasonably be found to be exclusionary, we must ask whether Blue Cross's conduct "went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill, and 'unnecessarily excluded competition'" from the health care insurance market. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir.1983) (citing *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 498 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

In the case at hand, the record amply supports Blue Cross's view that Prudent Buyer was a bona fide policy to ensure that Blue Cross would not pay more than any competitor paid for the same services. According to the policy, when physicians provided data on the lowest prices they accepted for particular services, and these prices were lower than those allowed by Blue Cross, Blue Cross lowered its price to match the lowest price accepted. When Ocean State physicians did not provide this price information, Blue Cross reduced its fee to the physicians by 20%, to correspond to Ocean State's 20% withhold. Blue Cross estimated that it saved $1,900,000 through this policy.

We agree with the district court that such a policy of insisting on a supplier's lowest price—assuming that the price is not "predatory" or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary. It is hard to disagree with the district court's view:

> As a naked proposition, it would seem silly to argue that a policy to pay the same amount for the same service is anticompetitive, even on the part of one who has market power. This, it would seem, is what competition should be all about.

*Ocean State*, 692 F.Supp. at 71.

This conclusion is also compelled by this court's holding in *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985) that a health insur-

er's unilateral decisions about the prices it will pay providers do not violate the Sherman Act—unless the prices are "predatory" or below incremental cost—even if the insurer is assumed to have monopoly power in the relevant market. *See id.* at 927.

*Kartell* concerned Blue Shield of Massachusetts's ban on balance billing, a price policy according to which Blue Shield paid participating physicians only if they agreed not to make any additional charges to the subscriber. We held that, for antitrust purposes, a health insurer like Blue Shield must be viewed "as itself the purchaser of the doctors' purchases." *Id.* at 924. As such, the insurer—like any buyer of goods or services—is lawfully entitled to bargain with its providers for the best price it can get. *See id.* at 928. "[E]ven if the buyer has monopoly power, an antitrust court ... will not interfere with a buyer's (nonpredatory) determination of price." *Id.* at 929. In the present case, Ocean State does not contend that the prices paid under the Prudent Buyer policy were "predatory" or below anyone's incremental cost. As Blue Cross argues, the legality of the Prudent Buyer policy rests *a fortiori* upon the holding in *Kartell.* In that case, Blue Shield sought to limit the fees to be charged by the physician to the subscriber; here, Blue Cross is limiting the price that *it* pays to the physician for services it is purchasing.

Ocean State argues that *Kartell* is a "vertical" case (involving the effects of Blue Shield's policy on its provider physicians), while the present case is "horizontal" (involving the effects of Blue Cross's policy on its competitor, Ocean State). But the distinction is of no consequence. In both cases the challenged activity is the price that the buyer offers to the seller. Moreover, in *Kartell* the physician plaintiffs contended that Blue Shield's balance billing ban was anticompetitive horizontally as well as vertically. The physicians argued that Blue Shield's pricing policy enabled it to attract more subscribers, thus "increasing its dominance in the health insurance business." *Id.* at 929. We rejected this argument, noting that it "comes down to saying that Blue Shield can attract more subscribers because it can charge them less." *Id.* at 930. Such an outcome—more business at lower prices— would not ordinarily run afoul of the antitrust laws.[11] Citing a case that centered on an allegation of injury by a horizontal competitor, we concluded that "Blue Shield seems simply to be acting 'as every rational enterprise does, *i.e.,* [to] get the best deal possible.'" *Id.* at 929–30 (quoting *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973).

In *Kartell* we cited several additional reasons why an antitrust court should hesitate to invalidate the Blue Shield-physician price bargain. Noting that the prices at issue were *low* prices, not high prices, we observed that "courts ... should be ... reluctant to condemn too speedily ... an arrangement that, on its face, appears to bring low price benefits to the consumer." *Id.* at 930–31 (citing *Barry Wright,* 724 F.2d at 231–34). We also expressed the view that courts should be reluctant to interfere in the domain of medical costs, "an area of great complexity where more than solely economic values are at stake." *Id.* at 931. Both of these considerations are relevant to the present case as well.

■ In one sentence of its opinion awarding judgment notwithstanding the verdict to Blue Cross, the district court stated that the same standards of anticompetitive conduct should apply to all market participants, regardless of their degree of market power: "There is no principle of antitrust law which would deny a business practice to any entity with market power and permit that practice on the part of a competitor who does not have market power." *Ocean State,* 692 F.Supp. at 71. Ocean State correctly observes that this

---

**11.** In the present case, Ocean State alleges that Blue Cross never actually passed along its savings to subscribers. But nothing turns on whether Blue Cross in fact lowered its rates. The fact remains that achieving lower costs is a legitimate business justification under the antitrust laws.

sentence misstates the law. In fact, the definition of "exclusionary" conduct cited above, *supra* at 1110, leaves open the possibility that certain "conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless, or even 'honestly industrial.'" *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274–75 (2d Cir.1979) (citation omitted), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). But the district court's ultimate judgment remains correct in this case, notwithstanding this misstatement. Even a monopoly can engage in a competitive course of conduct, so long as it does so for valid business reasons (such as the desire to get the lowest possible price), rather than in order to smother competition. *Compare Aspen Skiing*, 472 U.S. at 608, 105 S.Ct. at 2860 (the jury's conclusion that a monopolist's conduct was exclusionary "is strongly supported by Ski Co.'s failure to offer any efficiency justification whatever for its ... conduct") *with* the present case (in which the efficiency justification— lower costs—is evident).

Even if we assume that the Prudent Buyer policy, as written, is legitimate, Ocean State argues that Blue Cross applied the policy in a way that was in fact directed at the illegitimate goal of destroying Ocean State, rather than at the legitimate goal of lowering costs. But we do not believe that the evidence, even when viewed in the light most favorable to Ocean State, supports this contention.

■ First, Ocean State contends that although the Prudent Buyer policy was neutral on its face, Blue Cross in fact applied it only to Ocean State physicians. But even if we assume for argument's sake that Blue Cross selectively applied Prudent Buyer in this way, its conduct remains legitimate. It was primarily Ocean State physicians who were selling their services at a lower price to another provider (Ocean State) than to Blue Cross. Indeed, it was

Ocean State's lower pricing policy—in particular, its 1986 decision not to return its participating physicians' withholds for 1985 —that gave rise to Prudent Buyer. Therefore, it seems only logical—and not illegitimate—for Blue Cross to have focused its efforts in applying Prudent Buyer on Ocean State physicians.

■ Second, Ocean State argues that Blue Cross initially applied its policy to Ocean State physicians even before it knew whether Ocean State would return the 20 percent withhold for 1986 to its physicians. This left open the possibility that Blue Cross, by reducing its payments to Ocean State physicians by 20 percent, would actually be paying *less* than Ocean State. But even if we assume that these contentions are borne out by the record, we see nothing wrong with this conduct. Blue Cross offered to Ocean State physicians payment schedules that matched what they were *currently* accepting from Ocean State. The antitrust laws do not prevent a purchaser from making such an obviously reasonable and obtainable price bargain with a provider.

■ Third, Ocean State suggests that Blue Cross applied Prudent Buyer in a way that bribed some physicians into promising to resign from Ocean State. Ocean State contends that Blue Cross "exempt[ed] from Prudent Buyer some physicians who missed the Ocean State contractual cutoff date, and hence were automatically renewed for a year, if they pledged to drop out of Ocean State in the next year." The record does not support this allegation, however. The only evidence pointed to by Ocean State in support of this charge is the testimony of Thomas Aman, head of Blue Cross's professional relations department, that he had made such a promise to one podiatrist. Aman testified that he had thought the policy allowed for such an exemption, but then discovered that he had been mistaken. This evidence of a single instance of the misapplication of the Prudent Buyer policy is not enough to support the claim that the policy was used in an exclusionary way. Strikingly, not a single Ocean State physician testified that Blue

Cross directly encouraged him or her to resign from Ocean State.[12]

■ Finally, Ocean State points to evidence in the record that Blue Cross officials *hoped* that Prudent Buyer—together with HealthMate and adverse selection—would have the effect of destroying or weakening Ocean State. For example, there was testimony that Blue Cross's president had expressed—in none-too-polite terms—a desire to emasculate Ocean State. Another Blue Cross executive wrote in a handwritten note that "not one guy *in the state isn't going* to know the implication of signing with Ocean State" (emphasis in original). The jury may reasonably have concluded, on the basis of this and other evidence, that Blue Cross's leadership desired to put Ocean State out of business. But the desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws. As this court has noted, " 'intent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business,' and long-term effects on consumers depend in large measure on competitors' responses." *Barry Wright,* 724 F.2d at 232. As long as Blue Cross's course of conduct was itself legitimate, the fact that some of its executives hoped to see Ocean State disappear is irrelevant. Under these circumstances Blue Cross is no more guilty of an antitrust violation than a boxer who delivers a perfectly legal punch—*hoping* that it will kill his opponent—is guilty of attempted murder.

We conclude that the Prudent Buyer policy did not as a matter of law violate section 2 of the Sherman Act. The district court's judgment notwithstanding the verdict is therefore affirmed. Because we hold that Prudent Buyer does not violate the antitrust laws, we also affirm the district

court's refusal to enjoin the continued use of this policy.

## V. THE CLAIM OF TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

■ We also conclude that the district court was correct in granting judgment notwithstanding the verdict on Ocean State's pendent state tort claim of intentional interference with contractual relationships. Ocean State alleged that Blue Cross's conduct "interfere[d] with existing contractual relationships between Ocean State and Class Members." This claim seems to relate only to the Prudent Buyer policy, which is the only one of the challenged Blue Cross practices that directly concerns Ocean State's relationships with the class members, its participating physicians. The district court charged the jury, without objection, on this limited theory.

To establish a claim for tortious interference with a contractual relationship under Rhode Island common law, the plaintiff must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom." *Smith Development Corp. v. Bilow Enterprises,* 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). Blue Cross may defend against a claim of tortious interference on the ground that any interference was *justified. See id.; Mesolella v. City of Providence,* 508 A.2d 661, 670 (R.I.1986). Conduct in furtherance of business competition is generally held to justify interference with others' contracts, so long as the conduct involves neither "wrongful means" nor "unlawful restraint of trade." *Restatement (Second) of Torts* § 768 at 39 (1979). We are left to decide whether Prudent Buyer could have been found to be "wrongful" under Rhode Island law.

---

12. Ocean State likens Blue Cross's conduct to the efforts of the A & P company, found to be illegal in *United States v. New York Great Atlantic & Pacific Tea Co.,* 173 F.2d 79 (7th Cir.1949), "to exert pressure on suppliers either not to deal or to alter their dealings with A & P's competitors" (as summarized in *Travelers Insurance,* 481 F.2d at 85). We find the resemblance to be slight. A & P's pressure on suppliers included a

refusal to buy from suppliers who sold to anyone else through brokers. This, in turn, closed out competitors—presumably including smaller groceries—who were unable to buy directly from suppliers. *See A & P,* 173 F.2d at 83. In contrast, there is no evidence that Blue Cross refused to deal with Ocean State physicians, or that it pressured Ocean State physicians to alter their dealings with Ocean State.

The district court correctly—and without objection—instructed the jury on the law with respect to justification:

A Defendant's conduct does not constitute intentional interference with a contract if it is justified. As you have been instructed the law favors vigorous competition. Conduct is justified if it is action taken in legitimate competitive business activity. Competition means that a competitor will of necessity interfere with its competition. Thus the fact of interference is justified. It is only if the competitor uses methods of competition which are beyond those which competitors must expect to occur in the marketplace, that is, by competition which is based upon illegal [or] illegitimate means that you may find that any competitive action is unjustified.

Despite the jury's finding of liability, we hold that the Prudent Buyer policy was justified as a matter of law. As we have shown, Blue Cross's conduct was legitimate competitive activity that was not "illegal" under the antitrust laws. By the same token, and for essentially the same reasons, the conduct was not "wrongful" or "tortious" under state law. To be sure, not all business torts are "exclusionary" under the antitrust laws. *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 626d, 737b, 7381 (1978). In an appropriate case, a plaintiff might fail to establish an antitrust violation but still establish that certain torts had been committed. *See, e.g., Kartell*, 749 F.2d at 933–34 (noting the possibility that Blue Shield's conduct in that case, though not in violation of the Sherman Act, "might amount to minor business torts"). In the present case, however, Ocean State fails to allege any tortious activity other than precisely the same "anticompetitive" behavior alleged in its antitrust claim. Ocean State puts the matter this way in its brief:

The evidence concerning interference with contract largely overlaps that addressed to the antitrust count (see pp. 5–26, *supra*). Without unduly repeating ourselves, we note that there was varied and significant evidence from which the jury was able to find that Blue Cross acted anticompetitively to harm Ocean State and the physician class rather than merely to adapt reasonably to competitive pressures.

Under these circumstances, the antitrust law provides the best available barometer—indeed the only available barometer—of whether or not Blue Cross's conduct can be found to be "wrongful" or "illegitimate"—and, hence, tortious. No other relevant tort standards have been called to our attention in the case law or otherwise. For the same reasons that we held that Prudent Buyer did not violate the Sherman Act, therefore, we hold that it could not as a matter of law constitute tortious interference with plaintiffs' contractual relationships. Accordingly, we affirm the district court's judgment notwithstanding the verdict on the tortious interference claim and we deny Ocean State's motion for an additur to the jury award to the physician class.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's award of judgment notwithstanding the verdict to Blue Cross on both the Sherman Act and the tortious interference claims. We also deny Ocean State's motions for an injunction and for an additur in favor of the physician class.

*Affirmed.*